316 So.2d 100 (1975)
STATE of Louisiana
v.
Sammy H. JONES.
No. 56140.
Supreme Court of Louisiana.
June 25, 1975.
Rehearing Denied July 25, 1975.
Ernest E. Hartenstine, Asst. Public Defender, for defendant-relator.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Charles W. Borde, Jr., Durbin, Durbin, Borde & Fogg, Denham Springs, for plaintiff-respondent.
BARHAM, Justice.
Relator was convicted after a bench trial in the City Court of Denham Springs of driving while intoxicated, a violation of La.R.S. 14:98, and was sentenced to pay a fine of $175.00 or serve thirty days in jail. Upon relator's application we granted writs to determine the proper interpretation of La.R.S. 32:663 as it relates to the circumstances of this case and the objections based thereon during the trial of this matter. In related cases also being decided today, the same issue, as it relates to those cases, will be decided. See State v. Karol, La., 316 So.2d 106; State v. McGuffey, La., 316 So.2d 107; and City of Monroe v. Robinson, La., 316 So.2d 119.
On November 16, 1974 a pick-up truck being driven by relator collided with an automobile being driven by another motorist. The passenger in the automobile struck by the relator's vehicle was able to obtain the license number of the vehicle and the incident was immediately reported *101 to the local police. Fearing that the relator would be outside of their jurisdiction by the time they were able to locate him by the vehicle description, the local officers sent two State Troopers who happened to be present at the time of the report to search for the vehicle. The troopers located the relator and returned him to the city police station, where a Photo-Electric Intoximeter test (PEI) designed to measure the alcohol concentration in the blood was administered. The results of relator's PEI test revealed that the alcohol concentration in his blood was sufficient to render applicable the presumption that he was under the influence of alcoholic beverages found in La.R.S. 32:662, subd. A, par. 1c. After trial on the merits, the court found the relator guilty as charged, "* * * based on the PEI test that has been admitted into the record. * * *" At the time that the State offered the test results report into evidence, the relator objected to the introduction on grounds that the report was inadmissible because the State did not introduce the permit from the state department of health certifying that the person who administered the test was qualified and authorized to perform such test, as he contends is required by La.R.S. 32:663. Relator further objected to the introduction of the contents of the report on the basis that the State failed to show that the test was performed according to methods approved by the state department of health, which showing he contends is also required by La.R.S. 32:663. La.R.S. 32:663 provides:

"Chemical analyses of the person's blood, urine, breath or other bodily substance, to be considered valid under the provisions of this Part, shall have been performed according to methods approved by the state department of health and by an individual possessing a valid permit issued by said department for this purpose. The state department of health is authorized to approve satisfactory techniques or methods, to ascertain the qualifications and competence of individuals to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the department." (Emphasis here and elsewhere supplied.)
The State argues in brief that the requirements of La.R.S. 32:663 were met during the relator's trial, inasmuch as the operator who administered the test testified that he was certified by the department of health to do so and because the test was performed pursuant to a procedure set forth by the Louisiana Health and Human Resources Administration (the state agency which carries out the function of the state department of health) and promulgated in November, 1974. The State argues: "These methods are the same ones that were used under the old `Louisiana Department of Health'. This would surely uphold the argument that any PEI test given between January 1, 1973 [apparently the date in which the Louisiana Health and Human Resources Administration, whose function and authority superceded the `old Louisiana Department of Health' came into existence] and November 19, 1974, would be valid since the procedure was not changed * * *."
Initially we will consider the relator's argument that the State's failure to physically produce the health department permit authorizing the operator to administer the PEI test renders error the court's ruling allowing admission of the report into evidence.
La.R.S. 15:436, setting forth the "best evidence" rule applicable in criminal prosecutions, provides:
"The best evidence which from the nature of the case must be supposed to exist, and which is within a party's control, must be produced."
The testimony of the operator who administered the PEI test clearly indicates that the permit issued by the "health department," which he claimed to have, was *102 not of a permanent character but was such that recertification was required at some unstated intervals. This factor alone contributes to our determination that the permit or certificate itself is the best evidence of the operator's qualifications and authority to administer the PEI test. Mere testimony that the operator-witness possesses such a certificate is not enough in the face of relator's insistence that the certificate be produced; inspection by the relator of the permit or certificate would show on its face whether the operator was certified to render the PEI test at the time that the relator submitted to the procedure.
The implication of the operator's testimony in this case was that he possessed a permit from the appropriate authority under which he was authorized, at the time in question, to administer the PEI test. Nevertheless, the testimony is not totally clear and unequivocal that certification related to the exact point in time at which relator was tested. This temporal element is but one factor about which relator is entitled to satisfy himself regarding the validity of the operator's certification. Relator is entitled to hold the State to compliance with the "best evidence" rule and insist on production of the operator's permit itself. Upon relator's insistence, the trial court erred in admitting the test results report without requiring the State to show, by the best evidence "supposed to exist" and in the State's "control", that the operator was appropriately certified by the proper authority at the time he administered the PEI test, as required by La.R.S. 32:663.
Next, we turn to relator's contention that the introduction of the test results report was error for the additional reason that there was no showing that the test was performed in conformance with methods approved by the state department of health. As we noted previously, the State argues that the PEI test was conducted according to the method approved by the Louisiana Health and Human Resources Administration in November of 1974. In brief the State argued that the method for conducting breath tests approved and promulgated by the Administration was nothing more than a recertification of methods approved by the predecessor governmental agency responsible for approving satisfactory methods.
Nowhere, in the record does the purported November, 1974 procedure allegedly promulgated by the Louisiana Health and Human Resources Administration appear; nor does the record contain evidence that procedures and methods were ever promulgated by the Administration's predecessor in this area, the Department of Health. However, attachments appended to an amcus curiae brief filed by Department of Public Safety appear to correspond to the two pronouncements to which the State refers. The first document is a letter dated September 19, 1969 from George H. Hauser, M.D., Director of the Bureau of Laboratories, to the Assistant Director of the State Police Crime Laboratory. Therein it is stated that the techniques of breath analysis taught in the forty-hour course given by the Division of State Police and measured by the Photo-Electric Intoximeter "is hereby approved by the Louisiana State Department of Health." The second document, a pronouncement by the Administration which is dated December 19, 1974 (not November, 1974), states that "[t]he method approved for breath testing for alcohol is the Photo-Electric Intoximeter Test performed with the instrument manufactured by Intoximeter, Inc., St. Louis, Missouri or any equivalent machine which is approved by the Bureau of Laboratories, State Division of Health."
Assuming, merely for the sake of discussion, that the Court can take judicial notice of these documents, it would be necessary for us to determine if the "methods" contained in them constitute adequate compliance with the dictates of La.R.S. 32:663. Since these documents are clearly attempts on the part of the "state department of *103 health" to comply with the statutory provision mandating the department to approve "satisfactory techniques or methods" for conducting chemical analyses of blood, breath, urine or other bodily substance, we must decide the effect of these efforts, bearing in mind that the results obtained by use of these methods determine whether the presumptions contained in La.R.S. 32:662 come into play, and thus relieve the State of the burden of otherwise proving legal intoxication. Additionally, we examine these pronouncements in light of the fact that the Legislature intended, in enacting La.R.S. 32:663, "* * * to provide motorists who are deemed to have consented to such tests with the protection of the right to know that * * * the procedure used [in the analysis of his blood, breath, urine or other bodily secretion] complies with the minimum standards set by the department of health." State v. Junell, 308 So.2d 780 (La.1975) at 783.
Even a casual examination of the voluminous literature dealing with chemical tests for intoxication, their reliability, their validity and their drawbacks, compels the conclusion that this entire aspect of the law relating to the significance of the objective effects of alcohol ingestion in criminal prosecutions related to vehicle operation is fraught with difficulty. Although many jurisdictions accept the reliability of certain devices used to measure the blood alcohol concentration by use of breath tests, courts throughout the nation nevertheless generally require proof that the test was properly conducted. See, e. g., State v. Johnson, 42 N.J. 146, 199 A.2d 809 (1964). See also, the discussion appearing in R. Donigan, Chemical Tests and the Law at 60 (published by the Northwestern University Traffic Institute, 1966). The following language quoted from Donigan, supra, at 64 highlights one of the major deficiencies in the attempts of the state department of health to comply with La.R.S. 32:663:
"Upon the recommendation of the National Safety Council's Committee on Alcohol and Drugs and other national organizations, it is suggested in the Uniform Vehicle Code by the National Committee on Uniform Traffic Laws and Ordinances that there be legislation in each state requiring supervision at the state level of all chemical test programs. This would be in the nature of required approval of all test methods by an appropriate state agency, also approval by it of techniques to be employed in making such tests, and the checking by it of the qualifications of all persons who conduct such tests. * * *"
The Donigan text continues by noting Sec. 11-902(c) of the Uniform Vehicle Code (1962); in Junell, supra, we recognized that La.R.S. 32:663 had been "taken almost verbatim from § 11-902(c) of the Uniform Vehicle Code. * * *" There is, in fact, no substantive difference between our statutory provision and the pertinent provision of the Uniform Vehicle Code. Because Donigan seems to indicate that the "techniques to be employed in making such tests" are different from the "test methods," and because our statute speaks of "method" and "technique" in the disjunctive, it is arguable that La.R.S. 32:663 does not absolutely require that the department set out step by step procedures (techniques). However, careful consideration readily reveals that such reasoning is clearly specious, in light of the fact that test results establishing legal intoxication dispense with the State's obligation to affirmatively meet its burden of proving the "intoxication" element of the crime beyond a reasonable doubt. We therefore interpret La.R.S. 32:663 to mean that before the test results can trigger the presumption of intoxication and thus relieve the State of its burden of proof, much more than the mere designation of the name of a testing device and vague reference to some procedure or technique, without setting forth the *104 specifics of such procedure or technique (e.g., the Hauser letter of 9-16-69, approving breath analysis, "* * * as taught in the course * * *" taught by the Division of State Police) is necessary.
Numerous other reasons compel our determination that mere approval of a method by designating its name does not satisfy the requirement under La.R.S. 32:663.
In Donigan, it is noted:
"As in any other case in which evidence of the result of a scientific chemical test of any substance is involved, the attorney seeking to introduce such evidence must prove that a chemical test to determine blood alcohol concentration has been conducted with the highest degree of care and that the possibility of error has been eliminated or reduced to the minimum. * * *" Donigan, supra, at 66.
The Donigan text notes that in offering evidence obtained as a result of a breath test, the counsel offering such evidence must be able to meet contentions such as the following, which could cast doubt on the correctness of the test results:
"He must be ready to show:
"the mouthpiece, and the balloon if used, were fresh and uncontaminated; the vials, tubes, and other containers or instruments used were clean;
"the chemicals used were pure, fresh or unaffected by age, properly mixed, and of the proper quantity and strength;
"any chemicals or containers which require measuring or weighing were properly measured or weighed at the necessary times;
"the subject person had not consumed any substance containing alcohol within 15 minutes prior to the taking of the breath specimen, thereby eliminating the possibility of residue alcohol in the mouth or throat; and the stomach contents and the eating of such foods as garlic, onions, and the like do not affect breath analyses." Donigan, supra, at 67.
The first and fourth listing could easily be incorporated into a checklist such as that present in the record and presently used by the operator who administers the test. The listings dealing with the chemicals, however (Nos. 2 and 3), would require, as a matter of proof, that different methods of safeguards and checks and balances be promulgated and employed. The end result sought in requiring the department of health to articulate such safeguards and checks and balances can be summed up in this statement from Donigan: "* * * Clearly stated and complete rules of procedure, administration, and supervision are essential if problems * * * are to be avoided in the courtroom." Donigan, supra, at 73.
Another difficulty which we deem to be of major importance comes with the awareness that the high reliability of the measuring device, here the Photo-Electric Intoximeter, may be negated by failure to carefully follow proper operating instructions and reasonable maintenance and repair techniques. Regardless of the general reliability of the testing device, we believe that the heavy reliance placed on the results obtained from tests utilizing these devices requires that the methods and techniques promulgated by the state department of health include painstaking, step-by-step operating instructions and provisions for inspections and maintenance of these devices at stated intervals which will reasonably assure, absent specific proof to the contrary, that the device was functioning properly at the time of the administration of the test.
In connection with the problem of regular maintenance, a law review article dealing with tests for intoxication suggests that there are at least three possible alternatives in dealing with the problem of proving proper inspection and maintenance:
"* * * (a) The state court could presume regular maintenance in the absence *105 of specific evidence of the defendant raising doubts on this score.
"(b) The department could devise a procedure requiring all operators to be present when the technician performed his maintenance chores. * * *
"(c) The department could require that official logs be kept of all instrument checks, test results, and maintenance procedures. * * *" Watt, Some Observations on Police-Administered Tests for Intoxication, 45 Va.L.R. 34, at 84-5 (1966).
We do not indicate a preference for any particular procedure, whether listed above or not, but only point out the need for an established procedure with which compliance could then be shown. Any one of these alternatives or any other reasonable method could be utilized in our State courts to prove regular maintenance, once the department of health set up guidelines and procedures outlining operating instructions and requiring regular inspection and maintenance, a responsibility we believe is inherent in the department's duty to approve methods and techniques which will render the use of the La.R.S. 32:662 presumption and the procedure of relieving the State of its burden of proof consistent with the constitutional due process guarantee of a fair trial.
As must be evident from the foregoing, we find that even if we were to take judicial notice of the "methods" set forth by the department of health and the La. Health and Human Resources Administration, the "methods" do not satisfy the requirements of La.R.S. 32:663. In the instant case, there was no showing regarding health department procedures. For this additional reason, relator's conviction and sentence cannot stand.
In deciding the issue presented for our determination as we do, we do not imply that the State may not attempt to establish its burden of proving intoxication in DWI cases by other types of evidence not covered by the statutory scheme set forth in La.R.S. 32:661 et seq. The State may wish to rely, in attempting to meet its burden of proof, on testimony of arresting officers and others which relate indicia of intoxication discernible by the senses of sight, sound, or smell. Alternatively or additionally, the State may wish to present expert testimony, after there has been testimony of careful adherence to strict procedures in administering intoxication tests, to the effect that the measured level of alcohol concentration would impair the ability to function of the tested person to the extent that he would consider him intoxicated. The scope of our decision is no broader than to decree that the State may not avail itself of the presumptions available under La.R.S. 32:662 until the "state department of health", that is, the Louisiana Health and Human Resources Administration, establishes and promulgates carefully detailed methods, procedures and techniques covering, but not limited to repair, maintenance, inspection, cleaning, chemical accuracy, certification, proof of adherence to which would reasonably assure that the right articulated in Junell, supra, would be recognized and implemented in the courts of law of this State.
For all of the reasons set forth above, the relator's conviction and sentence are reversed and the case is remanded for a new trial.
Reversed and remanded.
SANDERS, C.J., dissents and assigns written reasons.
SUMMERS, J., dissents and assigns reasons.
SANDERS, Chief Justice (dissenting).
Assuming that the Photo-Electric-Intoximeter test was inadmissible, the independent evidence of intoxication in the present case is overwhelming.
*106 The independent evidence consists of the eye-witness testimony of another motorist, who was forced off the highway by the defendant, and of three police officers. I find no adequate reasons to upset the conviction.
For the reasons assigned, I respectfully dissent.
SUMMERS, Justice (dissenting).
I dissent for the reasons assigned by the Chief Justice.