418 So.2d 609 (1982)
STATE of Louisiana
v.
Patricia GREEN.
No. 81-KA-1863.
Supreme Court of Louisiana.
July 2, 1982.
Rehearing Denied September 3, 1982.
*610 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Carl Parkerson, Dist. Atty., Nancy Gilliland, Lavalle Satma, Asst. Dist. Attys., for plaintiff-appellee.
James A. Hobbs, Blackwell, Chambliss, Hobbs & Henry, West Monroe, for defendant-appellant.
*611 DENNIS, Justice.[*]
Defendant, Patricia E. Green, was convicted by a jury of two counts of negligent homicide, R.S. 14:32, and sentenced to three years at hard labor concurrently on each count. She appealed filing seven assignments of error.
On May 31, 1980, the defendant, Patricia E. Green, accompanied by a woman friend, drove from Monroe to Alexandria for a visit. On the return trip from Alexandria that evening, six miles outside Monroe, defendant's vehicle veered into the opposite lane and collided head on with a pickup truck occupied by a teenage couple. The truck overturned and burst into flames. The two teenagers, who were trapped inside, burned to death. According to a blood test performed about three hours after the accident, the defendant's blood alcohol level was .14%. Based on the time lapse, a state expert witness testified that her level would have been about .18% at the time of the accident. In her trial testimony the defendant admitted that she and her friend had packed a case of beer in an ice chest and that she had consumed portions of at least six cans of beer during the trip. Other witnesses testified that immediately before the accident the defendant had committed several traffic violations by tailgating, flashing her high beam head lights and passing dangerously.
ASSIGNMENT OF ERROR NO. 1
In her first assignment of error the defendant challenges a jury instruction which the trial judge gave on the statutory presumption of intoxication raised by the blood test results. The charge was almost identical to the instruction this court approved in State v. Daranda, 388 So.2d 759 (La.1980).[1] Defense counsel argues that the charge as to a mandatory presumption of intoxication withdrew from the jury the question of whether the defendant was negligent by being intoxicated. Our review of the charges reveals, however, that the jury was correctly instructed on both matters. From the instructions it is clear that the State was required to prove criminal negligence and that a finding that the defendant was intoxicated did not necessarily require the jury to find that she was criminally negligent. Therefore, we conclude that the issue of criminal negligence was properly submitted to the jury and that the instructions given should not have mislead or confused the jury. This assignment is without merit.
ASSIGNMENT OF ERROR NO. 2
In her second assignment the defendant argues that the trial court should have excluded the results of the chemical analysis of her blood because the analysis was not "performed according to methods approved by the Department of Public Safety," as required by La.R.S. 32:663.
The legislature and this court have recognized the importance of establishing safeguards to guarantee accuracy in chemical testing. In the same legislation which authorizes the chemical analysis of a motorist's blood and creates a legal presumption of intoxication in the event his blood contains the requisite per cent of alcohol, the *612 legislature conditioned the validity of the chemical test upon its having been performed according to methods approved by the Department of Public Safety. La.R.S. 32:663. In considering previous attacks upon the validity of the statutory design, this Court has expressed the opinion that, in order for the State to avail itself of the statutory presumption of a defendant's intoxication without violation of his constitutional due process guarantee of a fair trial, detailed methods, procedures and techniques must be officially promulgated to insure the integrity and reliability of the chemical tests including provisions for repair, maintenance, inspection, cleaning, chemical accuracy, and certification as well as proof of adherence to those methods, procedures and techniques. State v. Graham, 360 So.2d 853 (La.1978); State v. Jones, 316 So.2d 100, 105 (La.1975); cf. State v. Junell, 308 So.2d 780, 783 (La.1975).
In response to the constitutional requirements and the legislative mandate expressed by the statute, the Louisiana Department of Public Safety, promulgated methods, procedures and techniques for assuring the accuracy of the tests. See, Rules, Department of Public Safety, Breath and Blood Alcohol Analysis Methods and Techniques, 4 Louisiana Register, No. 10, p. 390 (1978). The rules and regulations are divided into thirteen detailed sections.
Section 11 of the Rules prescribes the methods according to which chemical analysis of blood shall be, conducted. That section, in pertinent part, provides:
"The methods approved for blood-alcohol analysis of blood are:
a. Gas Chromatography
(1) Headspace sampling with internal standard.
(2) Direct injection with internal control.
b. Distillation Method. * * *"
Section 12 of the Rules prescribes the types of blood alcohol kits which may be used in the chemical analysis, as follows:
"Blood drawn for the purpose of determining the alcoholic content therein shall have been taken with the contents of the `B-D Blood Alcohol Kit' No. 4990 or No. 4991 for postmortem determination (manufactured by Becton-Dickinson Division of Becton, Dickinson and Company, Rutherford, New Jersey), or by a similar blood collection kit approved by the Louisiana Department of Public Safety. `B-D Blood Alcohol Kits' or similar blood collection kits as approved will be made available to all law enforcement agencies by the Louisiana State Police Crime Laboratory."
The evidence is undisputed that the chemical analysis of defendant's blood was performed in accordance with one of the methods approved by the department, but that the blood collection kit used was not one of the types prescribed by section 12 of the rules or a blood collection kit previously approved by the department. The blood collection kit used, however, was identical to the prescribed kits except that it contained a liquid rather than a solid anti-coagulant. The state's expert witnesses testified without contradiction that use of a liquid anti-coagulant would protect the specimen from contamination as well as the officially approved solid anti-coagulant.
In order for a chemical analysis of a person's blood to be considered valid in a criminal action or proceeding arising out of acts alleged to have been committed by him while driving under the influence of alcohol, the analysis must have been performed according to methods approved by the Department of Public Safety. R.S. 32:663 (Supp.1977). It is clear from the record that the analysis of defendant's blood was performed according to a method approved by the department. The department's rule describing the types of blood collection kits which shall be used to preserve specimens prior to analysis does not prescribe a method by which the analysis shall be performed. It merely describes the types of blood collection devices which the department considers to be reliable. Although it is a statutory foundational requirement for admission of the result of a blood test that the analysis itself be performed according to an *613 officially prescribed method, the statute does not prohibit the introduction of test results merely because a different anti-coagulant or collection kit than that approved by the department was employed.
One of the important factors in direct analysis of specimens of blood is the protection from contamination of the specimen at the time of taking, during transportation to the chemist, and at the time of analysis. The attorney offering chemical test evidence must be able to show proper protection of the specimen within recognized standards from the time the needle was inserted into the flesh of the subject person until the chemist arrived at his ultimate conclusion after analysis. R. L. Donigan, Chemical Tests and the Law, p. 71 (1966). The department's rule prescribing approved anti-coagulants and collection kits, therefore, is an important safeguard, and scrupulous compliance with it facilitates a prima facie showing that the blood specimen was properly protected from contamination. Failure to use the type of anti-coagulant or kit on the list of those approved, however, does not require exclusion of the evidence if it can be proved by competent, admissible evidence that the collection device or anti-coagulant employed provided equivalent protection of the specimen. It is undisputed in this case that the specimen of defendant's blood was afforded an equivalent means of protection from contamination.
This assignment is without merit.
ASSIGNMENT OF ERROR NO. 3
In her third assignment of error the defendant argues that the trial court erred in refusing to give a requested special charge on criminal negligence. Instead of the requested charge, the trial judge read to the jury the definition of criminal negligence contained in the Criminal Code. R.S. 14:12. A requested special charge must be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given. La.C.Cr.P. art. 807. The charge requested by the defendant was not wholly correct, but was in conflict with the definition of criminal negligence provided by the Criminal Code. On the other hand, the definition given to the jury by the trial judge from the Criminal Code was wholly correct and pertinent and did not require qualification, limitation or explanation. Accordingly, this assignment of error is without merit.
ASSIGNMENTS OF ERROR NOS. 4 and 5
In her fourth and fifth assignments of error the defendant contends that the trial court imposed excessive sentences and did not properly state for the record the considerations taken into account and the factual basis therefor in imposing the sentences.
Defendant, Patricia E. Green, is a 27 year old white woman, who has been divorced from her only husband and has custody of her only child, a nine year old son. She has no prior criminal record, either as a juvenile or as an adult. She is employed as a licensed practical nurse by the St. Francis Medical Center in Monroe. Her supervisor and fellow workers report that she is a good worker and an excellent nurse. She has displayed a particular talent for comforting and establishing rapport with seriously injured and ill persons under intensive care. The defendant was born and grew up in a neighboring parish in Northeast Louisiana, of which her parents are still residents. The defendant admits to being a social drinker, primarily of beer, but she denies ever having used drugs. She states that she has refrained from any use of alcohol since the accident. The presentence investigation did not uncover any evidence that she is a heavy drinker or chemically dependent.
The fatal traffic accident resulted in the death by burning of two 17 year old youths. The young couple, well respected senior high school students, were returning home from a movie. They were trapped inside the vehicle and could be heard screaming by onlookers who were powerless to help because of the intensity of the flames. The *614 accident occurred when the defendant failed to properly negotiate a curve, veered left of the center line and crashed almost head-on into the youths' truck. The defendant suffered severe facial lacerations, a broken nose, and a broken collarbone. She was rendered unconscious for a short period by the accident.
In her statement contained in the presentence investigation report, the defendant said: "This thing has been on my mind constantly and I have often asked myself why couldn't it have been me. There's not a day or night goes by that I don't think about this. I am so sorry but there is nothing I can do to help at this time. My vehicle was covered just by the normal minimum insurance. I believe I have it with Kemper Insurance Company."
When a defendant has been convicted of a felony or misdemeanor, the primary considerations militating for the defendant's imprisonment, which must be considered by the court, are: the likelihood that the defendant will commit another crime if not incarcerated; the defendant's need of correctional treatment or custodial environment which cannot be provided to him outside of prison; and the deprecation of the seriousness of the crime which would result from the court's failure to imprison the defendant. La.C.Cr.P. art. 894.1.
There does not appear to be any evidence in this record from which the trial judge could have concluded that the defendant, Patricia E. Green, will commit another crime or that she needs to be kept in custody for treatment or correction. The record tends to support, however, his conclusion that the seriousness of the crime would be deprecated by a sentence which does not include a period of incarceration. The two young victims died a horrible death, and the mounting rate of fatalities caused by drunken drivers is now a grave concern both in this state and nationwide.
The trial court must weigh against the evidence for incarceration any mitigating circumstances, including: whether the defendant intended to cause or threaten harm; whether he acted under provocation; whether there were substantial grounds tending to justify his conduct; whether the victim induced the conduct; whether the defendant has made restitution for his crime; whether the defendant has a prior criminal record; whether the circumstances which produced the crime are likely to recur; whether the defendant's character and attitude indicate he is likely to commit another crime; whether the defendant is likely to respond affirmatively to probationary treatment; and whether the imprisonment of the defendant would entail excessive hardship on himself or his dependents. La. C.Cr.P. art. 894.1.
In this case several mitigating circumstances weigh in favor of a lesser sentence. Although the defendant's conduct took the lives of two high school seniors and caused grievous loss to their families, there is no evidence that she contemplated that her behavior would cause or threaten serious harm. She did not, however, act under inducement or provocation, and there were no grounds to excuse or justify her conduct. She has not compensated the victim's families, but she has little means other than a liability policy affording minimum coverage. As we noted earlier, because it is such an important consideration, the defendant has no juvenile or adult criminal record. Whether her conduct was the result of circumstances likely to recur is a difficult question since it involves the abuse of alcohol, a substance to which an alarming percentage of our population is addicted. Nevertheless, the presentence investigation among her friends and acquaintances reflects that the defendant has not been an habitually abusive drinker. Because of her character and attitude displayed in her work and in caring for her son as a single parent, it seems likely that unless she is addicted to alcohol that she will refrain from further criminal conduct. Even if she is addicted, this would not rule her out as a person who is likely to respond affirmatively to probationary treatment. And if she does not have a chemical dependency, there would appear to be a high probability of successful probationary treatment in her *615 case. The imprisonment would certainly impose a hardship on the defendant's nine year old son. He apparently would not lack for support and care from his grandparents and his father who live near his present home. However, he would be required to change his place of domicile and schooling if his mother's incarceration were of long duration. This and his mother's absence would impose a severe hardship, but it would not be excessive in comparison with other cases.
Ultimately, it appears that the considerations to be weighed are fairly clear. The defendant is basically a good person, having no criminal record, who is a productive member of society and a caring mother, and clearly is unlikely to commit another crime. On the other hand, the crimes she committed were extremely costly to society and the victims' families, having taken the lives of two promising young people. Her crimes also demonstrate a need for more severe punishment as a deterrent and example for others who would drive motor vehicles while under the influence of alcohol.
After weighing these considerations, the trial judge imposed a sentence of three years at hard labor on each count, concurrently. The maximum sentence permitted by statute would have been five years on each count, consecutively, or a total of ten years at hard labor. Based on American theory and practice, however, concurrent sentences are the usual rule for offenses arising out of the same transaction, at least for a defendant without a criminal record and in the absence of a showing that the public safety requires a longer sentence. State v. Underwood, 353 So.2d 1013 (La. 1977). Accordingly, we do not consider that ten years at hard labor establishes the upper limits of a constitutionally permissible sentence in this case.
In gauging the heaviness of the sentences, some amelioratory factors should be considered. Because the defendant is a first offender who has been sentenced to less than five years in prison and who has never previously been convicted of a felony in this or any other state or country, she is immediately eligible for parole.[2] R.S. 15:574.4 (Supp.1979). Due to the type of offense of which the defendant has been convicted, she will be eligible for work release six months before her earliest release eligibility date. La.R.S. 15:1111; Department of Corrections, Office of Adult Services, Regulation 30-14(A), Work Release Selection of Inmates, 4 La. Register No. 12, p. 486 (1979). The trial judge's imposition of a hard labor sentence rather than a local jail term is not necessarily a mark of severity. Adequate penal facilities for female prisoners are not available in many localities. Because of overcrowded parish jails, a sentence to the department of corrections may constitute more humane treatment of a woman inmate.
A majority of this court recently determined that a five year hard labor sentence was not excessive punishment for a first offender found guilty of a single count of negligent homicide under arguably less aggravated circumstances. In State v. Daranda, 398 So.2d 1053 (La.1981) the defendant's car spun out of control during a rainstorm and crashed into an oncoming vehicle. He testified that he was blinded by the other driver's automobile headlights. His blood contained .19% alcohol, however, and the other driver contradicted his testimony. A passenger in the vehicle with which defendant's car collided died 18 days after the accident from a streptococcus infection in fluid which accumulated on her brain as a result of injuries sustained in the accident. Stanley Daranda was a black first offender who had been steadily employed before his conviction, and there was no substantial evidence that the defendant would not have refrained from criminal activity and responded well to probationary treatment. There was evidence, however, that he had been a heavy drinker before the accident and had been arrested, but not convicted, *616 for DWI previously. This court held that "particularly in view of the evidence of defendant's extreme intoxication" the sentence was not excessive. Id. p. 1056.
Article 1, Section 20, La. Constitution of 1974, prohibits the imposition by law of excessive punishment. The imposition of a sentence, although within the statutory limit, may violate a defendant's constitutional right against excessive punishment that is enforceable by this court on appellate review of his conviction. State v. Sepulvado, 367 So.2d 762 (La.1979); La.C.Cr.P. art 894.1 provides appropriate criteria by which an appellate court may measure whether a sentence within statutory limits is nevertheless excessive, either by reason of its length or because it specifies confinement rather than less onerous sentencing alternatives. 367 So.2d at 769.
Applying these precepts to the evidence in this case, we conclude that the sentences imposed by the trial judge were within reason and do not amount to constitutionally excessive punishment. A strong case has been made for a lesser sentence or probation, considering that it does not appear likely that the defendant would break the law again or violate any reasonable condition of probation. It does not outweigh, however, the need to impose a sentence of incarceration in this case in order to prevent further depreciation of respect for the law and to discourage other potential lawbreakers from the dangerous criminal conduct of operating a motor vehicle while under the influence of alcohol. The sentences are not excessive in length considering that they have been imposed concurrently and that the defendant appears to be an excellent candidate for early probation and work release. The trial judge's statement of his sentencing reasons was sufficient justification of his choice of penalty when considered in light of the thoroughly detailed presentence report and the full record of the trial over which the same judge presided. The trial judge acted within the ambit of his authority under both the constitution and the statutes in imposing the sentences.
The defendant's convictions and sentences are affirmed.
AFFIRMED.
FELIX H. SAVOIE, Jr., J. Ad Hoc, dissents and assigns reasons.
SAVOIE, Justice Ad Hoc, dissenting.
I respectfully dissent.
Defendant, Patricia Green, was charged by bill of information, with two counts of negligent homicide, a violation of R.S. 14:32. On April 13-16,1981, defendant was tried by a six-member jury and found guilty as charged. She was sentenced on May 14, 1981, to serve three years at hard labor on each count, sentences to run concurrently.
A blood test was performed on the defendant after the accident. A state criminalist testified that, at the time of the accident, her blood alcohol level must have been .18%. The statutory presumption of intoxication in Louisiana attaches at .10%. Criminalist Roy Herd testified that .18% causes "severe mental impairment".
The defendant argues that the court below erred in instructing the jury on the presumption of intoxication contained in La.R.S. 32:662 ("If there was at that time 0.10 per cent or more by weight of alcohol in the person's blood, it shall be presumed that the person was under the influence of alcoholic beverages"). It is argued that this presumption is contrary to the presumption of innocence guaranteed by our constitution. This court considered this claim in State v. Daranda, 388 So.2d 759 (La.1980) and held the statutory presumption constitutional on grounds that the fact required to be proven (blood alcohol content of .10% or more) supports the fact presumed (intoxication) beyond a reasonable doubt. This is consistent with the United States Supreme Court jurisprudence on mandatory presumptions in criminal cases set out in County Court of Ulster County v. Allen, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
The defendant next objects to the admission at her trial of testimony concerning the *617 blood test to which she submitted after the accident and to the admission of the blood itself into evidence. The ground of both objections is that the test was not performed in conformity with the mandatory provisions of La.R.S. 32:663.
The relevant portion of the statute provides:
"Chemical analyses of the person's blood... to be considered valid under the provisions of this Part, shall have been performed according to methods approved by the state department of health ...".
Pursuant to the authority thus statutorily granted, the department has promulgated rules for the administration of such tests which have been published in the Louisiana Register, Vol. 4, pp. 390-393. Rule 12 states that the blood is to be drawn with the contents of the B-D Kit # 4990 or # 4991 or by a similar blood collection kit approved by the Department.
Cross-examination of the state criminalist at trial revealed that neither the # 4990 nor the # 4991 kit was used in this case, because the supply of them was exhausted at the time. Instead, the contents of the kits were purchased separately from a local supplier, and were identical in all respects to the # 4990 and # 4991 kits except that a solid rather than a liquid anti-coagulant was used. There was unequivocal testimony that this could not affect the test results.
It might be that there would be reason for a finding of harmless error, if this were simply a question of the admissibility of this evidence. But coupled with the question of admissibility is the system of statutory presumptions. While there is no valid constitutional objection to the presumptions themselves, their operation trenches so closely on the constitutional presumption of innocence as to require the very strictest compliance with the statutory requirements. In State v. Morrison, 392 So.2d 1037 (La.1980), this Court reversed a drunk driving conviction because the blood test had been admitted without adequate evidence showing that the machine used to perform the test was regularly adjusted by a qualified technician. We reversed even though the case was tried before a judge sitting alone, and the judge had declared there was other evidence in the case sufficient to convict.
In State v. Jones, 316 So.2d 100 (La.1975), this Court reversed a conviction where the blood test testimony was given by the technician who performed the test, and that technician failed to produce in court his health department license, showing that he was authorized, under the statutory terms, to perform such tests.
In State v. Graham, 360 So.2d 853 (La. 1978), writ granted and remanded, 375 So.2d 374 (La.1979), this Court reversed a conviction where the prosecution failed to produce a manufacturer's certificate or other form of prima facie proof of standard chemical quality of the test chemicals used. The Court stated that such failure could not be excused as an inconsequential departure from the painstaking methods, techniques and procedures formulated by the department in response to an act of the Legislature and the decisions of this Court. This Court further stated:
"A conviction obtained through chemical test legislation, which not only destroys a defendant's presumption of innocence but also severely restricts any possibility of a defendant proving his innocence, must be reversed if not accompanied by all of the safeguards designed to insure reliable chemical analysis."
When we consider together the mandatory statutory language "... chemical analyses... to be considered valid ... shall have been performed according to methods approved by the state department of health" coupled with the great prejudice to a defendant when a jury is instructed that, as a practical matter, they must find a crucial fact probative of guilt, we are convinced of the rightness of the Graham, Jones and Morrison cases. We are convinced that the same result is inescapable in this case. If the state wishes to obtain the high degree of jury control represented by the statute in question, it must strictly adhere to the wording thereof.
*618 In view of the foregoing, I would reverse the conviction and sentence.
NOTES
[*] Judges Melvin A. Shortess, Burrell J. Carter and Felix H. Savoie, Jr. of the Court of Appeal, First Circuit, participated in this decision as associate justices pro tempore, joined by Associate Justices Dennis, Blanche, Watson, and Lemmon.
[1] In the present case the trial court's instructions were less problematic than those in Daranda. In the instant case the jury was instructed as follows:

"Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interests of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
* * * * * *
"There is no presumption of criminal negligence in favor of the prosecution. As stated, the burden is on the state to prove every element of the offense beyond a reasonable doubt. Our law does provide that if at any time in question there is point one zero percent (.10%) or more, by weight, of alcohol in a person's blood, it shall be presumed that the person is or was under the influence of alcoholic beverages."
[2] This provision does not apply to offenses committed after July 1, 1982. R.S. 15:574.4 (Supp.1981).