h SAUNDERS, Judge.
The defendant, Jerry L. Wiley, was charged by a bill of information dated July 12, 1993,[1] with a third-offense DWI, violating Louisiana Revised Statutes 14:98(D). The offense occurred on March 20, 1993. On March 14 and 15, 1994, the jury returned a verdict of guilty as charged. The trial court ordered a presentence investigation, and on May 27, 1994, sentenced the defendant to thirty (30) months at hard labor without benefit of probation, parole or suspension of sentence.
The defendant filed a motion to reconsider sentence on June 1, 1994; the trial court denied that motion by ex parte order.
12From that conviction and sentence, the defendant has timely perfected this appeal and assigns two errors.

FACTS

At approximately 7:30 p.m. on March 20, 1993, the defendant was driving on Highway 1211 in Vernon Parish, when he veered into the wrong lane and caused an oncoming driver to run off the road. The other driver left the road completely and the two cars collided, spinning the other - driver’s car. Both men were taken to the hospital. State Trooper David Jett arrived at the scene, observed the defendant, and later observed him again at the hospital.
Trooper Jett testified that WILEY’S speech was slurred and his breath smelled strongly of alcohol. WILEY refused medical treatment even though his leg was obviously injured. Trooper Jett placed WILEY under arrest and Mirandized him, and then released him to the custody of the emergency medical technicians on the scene.
After arriving at the hospital, Trooper Jett requested that the hospital staff draw blood samples from WILEY for the purpose of checking his blood alcohol level. The trooper advised WILEY of his rights concerning the blood test, then Ms. Norma Frisby, a registered nurse, drew the blood while Trooper Jett watched. The blood sample was stored by the state police, then taken to the crime lab in Alexandria. Crime lab tests established WILEY’S blood-alcohol level was 0.21.

ERRORS PATENT

13Louisiana Code of Criminal Procedure article 920 provides the scope of this court’s review on appeal:
The following matters and no others shall be considered on appeal:
(1) An error designated in the assignment of errors; and
(2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.
In accordance with that article, all appeals are reviewed on the face of the record for errors patent. After reviewing the record, we find no errors patent.

ASSIGNMENT OF ERROR NO. 1

Defendant’s first assignment of error is that the trial court erred in allowing the state’s analysis of the defendant’s blood into evidence.
WILEY alleges that the blood alcohol test was unreliable because the preservatives contained in the blood kit may have expired. Consequently, WILEY argues that the trial *841 court erred in admitting the test results into evidence.
Louisiana Revised Statutes 32:662 provides:
A. The chemical test or tests as provided for by this Part shall be subject to the following rules and shall be administered as provided for hereafter:
(1) Upon the trial of any criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a vehicle while under the influence of alcoholic beverages the amount of alcohol in the person’s blood at the time alleged as shown by chemical analysis of the person’s blood, urine, breath or other bodily substance shall give rise to the following presumptions:
(a) If there was at that time 0.06 per cent or less by weight of alcohol in the person’s blood, it shall be presumed |4that the person was not under the influence of alcoholic beverages.
(b) If there was at that time in excess of 0.05 per cent but less than 0.10 per cent by weight of alcohol in the person’s blood, such fact shall not give rise to any presumption that the person was or was not under the influence of alcoholic beverages, but such fact may be considered with other competent evidence in determining whether the person was under the influence of alcoholic beverages.
(c) If there was at that time 0.10 per cent or more by weight of alcohol in the person’s blood, it shall be presumed that the person was under the influence of alcoholic beverages.
(2) Percent by weight of alcohol in the blood shall be based upon grams of alcohol per one hundred cubic centimeters of blood.
B. The foregoing provisions of this Section shall not be construed as limiting the introduction of any other competent evidence bearing upon the question whether the person was under the influence of alcoholic beverages or any abused or illegal controlled dangerous substance as set forth in R.S. 40:964.
C.This Section has no application to a civil action or proceeding.
In addition, the relevant regulation provides, in pertinent part:
1. All kits approved by this department shall contain the necessary preservative to insure stability of the sample as provided by the manufacturer and contain no ethyl alcohol. Each approved kit must be manufactured specifically for blood alcohol determinations in living or post-mortem subjects.
[65 La.Reg. 555G(1) 1991],
In interpreting the law and the admissibility of blood alcohol test, the Louisiana Supreme Court has held:
“One of the important factors in direct analysis of specimens of blood is the protection from contamination of the specimen at the time of taking, during transportation to the chemist, and at the time of analysis. The attorney offering chemical test | sevidence must be able to show proper protection of the specimen within recognized standards from the time the needle was inserted into the flesh of the subject person until the chemist arrived at his ultimate conclusion after analysis. R. L. Donigan, Chemical Tests and the Law, p. 71 (1966). The department’s rule prescribing approved anti-coagulants and collection kits, therefore, is an important safeguard, and scrupulous compliance with it facilitates a prima facie showing that the blood specimen was properly protected from contamination. Failure to use the type of anti-coagulant or kit on the list of those approved, however, does not require exclusion of the evidence if it can be proved by competent, admissible evidence that the collection device or anticoagulant employed provided equivalent protection of the specimen.”
State v. Green, 418 So.2d 609, 613 (La.1982) (emphasis added).
If the kit and any of its component parts used in WILEY’S case had expired or in some other way did not exactly comply with Louisiana law, that evidence should not be admitted unless it can be proved by competent evidence that the test kit and the man *842 ner in which it was used provided the requisite protection of the specimen.
A review of the testimony in this case establishes that the test Mt used in this case was reliable and provided WILEY with the safeguards required by law. Specifically, the crime lab chemist, T.J. Shuflin, testified as follows:
“Q. Are these the blood samples that you conducted any testing on, sir, for blood alcohol levels?
A. Yes sir.
Q. How can you tell that, sir?
A. In addition to the markings on the plastic container the two tubes inside the kit are marked with the case number and my initials, each of the tubes are marked.
Q. So, there is no doubt in your mind that these are the same blood vials that you conducted testing on in reference to the defendant, Jerry Wiley, is that correct, |6sir?
A. That’s correct.
Q. I have another question to ask you about this box, sir, before we get into how you did this testing. On the side of this box somewhere there is a Lot Number 2880, there is also typed ESP. Date which, I assume, means expiration date, is that correct sir?
A. That’s correct.
Q. The date on this box is 12/31/91, could you tell the ladies and gentlemen of his jury and the court, Mr. Shuflin, what that expiration date has to deal with?
A. I’ll have to explain a little bit about the kit and the tubes inside.
Q. Okay, go ahead.
A. This is what’s known as a vacutainer (PHONETIC) kit and the two tubes that are inside the kit, when they are placed in the kit and sent to the police department to be used, there is a vacuum in each of those tubes, that’s why they call it a vacutainer (PHONETIC) kit. The expiration date is put on there to offer a date that the company feels that the vacuum within the tubes will be good and valid at least up until that date. It will more than likely be good after that date, but, they don’t quote ‘guarantee’ it. But, there is nothing asfar-as [sic] any decomposition or anything with the kit that would make it not useable [sic] except for the fact that it might not have sufficient vacuum in the tubes to fill the tubes with blood.
Q. Mr. Shuflin, does it in any way effect any reliability of any result you gain from doing your testing.
A. No sir.”
(Emphasis added.)
The testimony concerning the expiration date and the effect on the chemical preservatives used in the kit test is equally clear concerning reliability. Mr. Shuflin testified:
|7“Q. Now, the nurse who drew the blood has testified that in one, at least one of these vials, when she receives it before she draws the blood is a substance of some kind?
A. Yes sir.
Q. Tell us about that if you can.
A. Okay. The vials contain a powdered substance in each of the vials. The substance could be one of two or a combination of those two. They have changed formulations on different occasions and there are different kits that are used. The two substances that would be used could be one, either sodium fluoride or what’s known as sodium editate (PHONETIC) or it is abbreviated sodium edta, one acts as an anticoagulant and one acts more as a preservative. The anticoagulant, the sodium fluoride, in a higher concentration can also act as a preservative. I would have to look at the tubes in this kit to see which or if there was a combination of the substances in the tubes. It would be on the tubes.
Q. You can tell that from the kit as it exists now?
A. Yes sir, it should be on the tubes, yes sir.
Q. And, you said that each vial would have had that substance in whenever it *843 was handed to the nurse for the blood to be drawn?
A. Yes sir. (WITNESS REVIEWS TUBES) This is the tube that I analyzed and it says sodium fluoride.
Q. Alright.
A. And, also this one says sodium fluoride.
Q. So these particular vials have sodium fluoride as opposed to the other substance that you talked about?
A. Yes sir.
Q. Now, the sodium fluoride is for what purpose?
A. It acts as an anticoagulant and in this kit it’s in a concentration sufficient to act as a preservative also.
Q. What color is sodium fluoride?
A. It’s sort of a whitish, pinkish type powder.
|8Q. And, I’m not going to ask you to tell me what it’s made out of because that would probably just go over everybody’s head here, but, in particular, the expiration date that is on the kit, you said that applied primarily to the vacuum that would be in each vial?
A. That’s correct, yes sir.
Q. Now, my question to you is the sodium fluoride that would be in each of these particular vials, does it have a particular type of shelf life asfaras [sic] you know? In other words, once it’s placed in there, after a certain passage of time does it start to lose whatever effect it might have had and the purpose for which it would have been intended?
A. No sir, let me make a comparison, sodium fluoride is very, very similar chemically to a very common component that everybody’s aware of and that would be sodium chloride or common table salt. And, they, while not being identical, are very, very similar. They are almost identical in chemical formulation. The sodium chloride, table salt will remain table salt for a very long period of time unless something is mixed with it. The same in this case with sodium chloride, it’s a very stable powder and there is not going to be any degradation or decomposition of that powder.”
(Emphasis added.)
Norma Frisby’s testimony indicated that the colors of the substances she remembered seeing in the vials after opening the kit may have looked different than they should have. The testimony of the crime lab chemist, however, established that the discoloration of the chemicals inside the vials, if any, did not compromise the reliability or accuracy of the test. Mr. Shelfin’s testimony continued:
“Q. The expiration date on there, you’ve already said it applies to the vacuum, but, would that also perhaps be applicable to the substance that’s in the vials that the lab is saying use this kit by that time because not only will the vacuum possibly be effected [sic] but the substance in the vials?
A. Not to my knowledge, no sir. In our training in that three day seminar that I attended that I had to attend prior to the | certification where there was a change in the regulations this was discussed extensively and the Department of Public Safety in Baton Rouge had communication with the manufacturer and that was discussed extensively and my training is that the expiration date applies to the vacuum of the tubes.
Q. Let’s assume, though, for the sake of this series of questions that the yellowish color that may have been in the vials, do you know whether or not that would effect [sic], and, let’s say for the sake of this discussion that the yellowish color indicated that the sodium chloride had somehow begun to decompose or lose whatever effect it is supposed to have, would that make any difference therefore in any test results or can you even say whatever it would make any difference in the test results ultimately that you would receive from the sample of the blood that was in that vial?
A. I’m not going to be able to testify to anything about that because I have no experience and I can’t make assumptions that could be invalid about whether that substance would change because there is nothing to base any opinion on.
*844 Q. Well, as I understand it this is a preservative, so, it preserves the blood that is in the vials so that hopefully when you test it at some point in time it is a good sample that will give you a valid and accurate reading?
A. Yes sir.
Q. Now, if something happened to that blood, such as a failure of the preservative or a failure of the anticoagulant would it be correct say that the test results therefore may not be as accurate and valid as you would want them to be?
A. Well, you could make that statement but I didn’t see any deterioration of this blood sample. It was not coagulated, therefore the substance that was in there performed it’s anticoagu-lation properties in a proper manner. Also, the samples had no odor that would have indicated any putrefacation [sic] or decomposition of the blood, therefore, the substance that was in there performed the preservative properties adequately.”
(Emphasis added.)
In sum, the record clearly established: (1) the chemical preservative was still effective despite the expiration date, (2) the expiration date | ipapplies to the effectiveness of the vacuum tube and not the preservative, (3) the equipment used in conducting the tests was fully calibrated and producing accurate results, and (4) there was no signs of deterioration or decomposition of the samples tested. Consequently, we find that the blood alcohol test kit was admissible.

ASSIGNMENT OF ERROR NO. 2

Defendant’s second assignment of error is that the trial court erred by sentencing the defendant to an excessive sentence which constitutes cruel and unusual punishment.
In a recent opinion, State v. Smith, 639 So.2d 237, 240 (La.1994), the Louisiana Supreme Court held:
“(1) [W]hile a trial judge must consider the Guidelines, he has complete discretion to reject the Guidelines and impose any sentence which is not constitutionally excessive, but is within the statutory sentencing range for the crime of which a defendant has been convicted, so long as he states for the record the considerations taken into account and the factual basis for his imposition of that sentence, La.Code Cr.P. art. 894.1; and (2) where the trial judge has considered the Guidelines and imposed a sentence, adequately stating for the record the considerations taken into account and the factual basis for imposition of that sentence, an appellate court is limited to a review of the sentence imposed for constitutional excessiveness, without regard as to whether the trial judge either employed or deviated from the Guidelines.”
(Footnote omitted.)
Article 1, Section 20 of the Louisiana Constitution of 1974, prohibits “cruel, excessive, or unusual punishment.” A sentence which falls within the statutory limits may nevertheless be excessive. State v. Naquin, 527 So.2d 601, 602 (La.App. 3d Cir.1988). To constitute an excessive sentence this court must find that the penalty is grossly disproportionate Into the severity of the crime as to shock our sense of justice or that the sentence “makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than needless imposition of pain and suffering.” State v. Campbell, 404 So.2d 1205, 1207 (La.1981); State v. Everett, 530 So.2d 615, 624 (La.App. 3d Cir.1988); writ denied, 536 So.2d 1233 (La.1989).
The trial judge is given wide discretion in imposing a sentence, and a sentence imposed within statutory limits will not be deemed excessive in the absence of manifest abuse of discretion. State v. Howard, 414 So.2d 1210, 1217 (La.1982).
In stating for the record the considerations taken into account and the factual basis for imposition of the sentences, the trial judge noted the following:
“BY THE COURT:
Very well. I note, making reference to the sentencing guidelines in this case that this offense would appear to carry with it a classification of 7-D. The recommended sanction is an intermediate sanction. The incarceration range set forth in the guide *845 lines is fifteen to twenty-four months. The sanction units set forth are ninety to one thirty-five. As I look at the matter and consider the factors I’m impressed by a number of things. This is a second felony conviction for Mr. Wiley. In 1979 he was convicted in North Carolina of the felony offense of taking indecent liberty with a minor and was sentenced to the [Department of [C]orrections. More importantly, however, this is the defendant’s fifth arrest for driving while intoxicated. On March 22, 1983 he was so charged, and on May 31, 1983 forfeited his bond in the Leesville City Court. Defendant was arrested on July 22, 1983 and charged with driving while intoxicated in the Leesville City Court. The matter was continued on August 16, 1989. It’s simply unknown to the court what happened to that charge. After an accident on August 25, 1990 the defendant was charged with driving while intoxicated and two counts of | ^negligent injuring. After a plea of nollo [sic] conten-dere the defendant was fined, given a suspended jail term and placed on supervised probation which expired on January 25, 1993. However, on December 12, 1992, while the probation was still in effect, the defendant was charged with driving while intoxicated second offense in the Eleventh Judicial District Court in Sabine Parish. On April 21, 1993 he pled guilty, was fined, given a suspended jail sentence and placed on supervised probation. This offense occurred on March 20, 1993. In both this offense and the one which occurred on August 25,1990 serious injuries resulted to other innocent parties who were rightfully using the highways. It is true that the defendant is married and his absence will create some disruption in his family life. Mr. Wiley is a veteran of the United States Navy. His usual occupation is that of an auto mechanic. He denies use of illegal controlled dangerous substances. He admits the use of alcohol. Considering the number of DWI arrests, the total lack of success of probationary treatment and that on two occasion this defendant has been drinking and driving and has collided with other persons producing grave injuries with permanent residuals and great expense, and, considering even the defendant’s failure to appear for trial in this ease when the matter was fixed for trial and he was called and didn’t show, it is the opinion of the court that any sentence less that the sentence proposed by this court would simply serve to deprecate the seriousness of his conduct in this case. Considering all of those factors, among others, it’s the sentence of the court that Mr. Wiley serve two and one half years at hard labor with the Louisiana Department of Corrections to be served without benefit of suspension of sentence, probation or parole.”
As the trial court considered the sentencing guidelines and set forth a factual basis for the sentence on the record, this court need only review the sentence imposed for constitutional excessiveness.
Louisiana Revised Statutes 14:98(D) provides for a maximum sentence of five years at hard labor with at least six (6) months without benefit of parole, probation, or suspension of sentence. The defendant’s drunken driving has caused serious injuries in the past, yet he has failed | igto correct his dangerous behavior. We do not find that the penalty is so grossly disproportionate to the severity of the crime as to shock our sense of justice. The sentence makes a measurable contribution to acceptable penal goals. We hold that the sentence is not “cruel, excessive, or unusual punishment,” and that WI-LEYS assignment of error is meritless.

CONCLUSION

For the foregoing reasons, we affirm the conviction and sentence of the defendant, Jerry L. Wiley.
AFFIRMED.

. The bill of information was amended January 3, 1994.