# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 06-1115

**STATE OF LOUISIANA**

**VERSUS**

**JAKE C. DESOTO**

**********

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 127704
HONORABLE FRANK FOIL, DISTRICT JUDGE AD HOC

**********

**ELIZABETH A. PICKETT**
**JUDGE**
**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Elizabeth A. Pickett, Judges.

Thibodeaux, Chief Judge dissents and assigns written reasons.


**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

**David Edwin Lafargue**
**Lafargue Law Office**
**P. O. Box 277**
**Marksville, LA 71351**
**(318) 253-7521**
**Counsel for Defendant-Appellant:**
**Jake C. DeSoto**

**Hon. Charles A. Riddle III**
**District Attorney, 12th JDC**
**P. O. Box 1200**
**Marksville, LA 71351**
**(318) 253-6587**
**Counsel for Plaintiff-Appellee:**
**State of Louisiana**

**Norris Joseph Greenhouse**
**Assistant DA, 12th JDC**
**214 Main Street**
**Marksville, LA 71351**
**(318) 253-6394**
**Counsel for Plaintiff-Appellee:**
**State of Louisiana**

**Pickett, Judge.**

<u>FACTS</u>

The defendant, Jake DeSoto, and Kain Roy left the hunting camp of Jerold "Eddie Boy" Knoll, Jr., to go hunting on November 20, 2004 between 2:30 and 3:00 p.m. The two eventually separated and made their way to deer stands on land belonging to Bruce Beauregard. At approximately 5:30 p.m., the defendant shot what he thought was a deer. He subsequently discovered that he had in fact shot Roy, who was lying in a slough. Roy died as a result of his injuries.

Dr. L. J. Mayeux testified that the shot that killed Roy was fired parallel to the ground and parallel to Roy's neck.[1] Additionally, it was fired from the ground and not from a tree stand. The bullet that killed Roy actually penetrated the back collar of his jacket before entering the back of his neck. Dr. Mayeux further testified that Roy died as a result of blood loss from branches of the internal carotid and jugular veins and drowning.

Detective Daniel Schaub, an employee of the Avoyelles Parish Sheriff's Department, testified that at the time of his death Roy wore a gray shirt with "MHS" on the front, a camouflage jacket, and boots. Detective Schaub further testified that Roy's shirt was lighter than the jacket he wore. Dr. Mayeux confirmed the description of the clothing Roy wore, but also indicated Roy wore jeans and a "boon" cap. Dr. Mayeux further testified that the gray shirt Roy wore would have been lighter than depicted in photographs if the shirt had been dry.

On March 21, 2005, the defendant, Jake C. Desoto, was charged by bill of

---

[1]There was a demonstration wherein Mr. Mayeaux used the District Attorney to show the jury where the entrance and exit wounds were. The jury was also shown the angle of Roy's body when he was shot. However, these demonstrations were not described for the record.

1

indictment with negligent homicide, a violation of La.R.S. 14:32. The defendant entered a plea of not guilty on April 11, 2005.

Trial by jury commenced on January 31, 2006, and the jury returned a verdict of guilty on February 2, 2006. A Motion for Post Verdict Judgment of Acquittal or in the Alternative Motion for New Trial was filed on March 10, 2006 and denied on March 20, 2006. On March 27, 2006, the defendant was sentenced to serve five years without hard labor with the last two years of the sentence suspended. The trial court further ordered the defendant to be placed on supervised probation for a period of two years upon his release from incarceration. A Motion to Reconsider Sentence was filed on April 25, 2006 and denied at a hearing held on May 16, 2006.

A Motion for Appeal was filed on May 16, 2006. The defendant is now before this court asserting four assignments of error.

## ASSIGNMENTS OF ERROR

The defendant assigns as error the following:

1. The State failed to prove criminal negligence beyond a reasonable doubt.

2. The court's sentence was excessive and illegal.

3. There was a defect in the proceedings since a recused judge participated in the process.

4. The trial court erred in allowing simulation evidence.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find one error patent involving the sentence imposed and one error in the minutes of sentencing.

2

First, the trial court failed to impose a supervision fee as a condition of the defendant's probation. The trial court ordered the defendant to "pay the probation and other fees as required by law and regulation," but failed to specify a monthly probation supervision fee. Louisiana Code of Criminal Procedure Article 895(A) provides in pertinent part: "When the court places a defendant on probation, it shall require the defendant to refrain from criminal conduct and to pay a supervision fee to defray the costs of probation supervision . . ." Article 895.1(C) further provides that the supervision fee must be paid monthly and must not be less than $50.00 nor more than $100.00.

This court has stated the following regarding a trial court's failure to set a probation supervision fee:

> When remanding a case for imposition of a supervision fee as a condition of probation, this court has stated:
>
>> The defendant's sentence does not necessarily have to be vacated if the trial court decides to set the minimum monthly supervision fee. *See State v. Harris*, 93-1098 (La. 1/5/96); 665 So.2d 1164. In *Harris*, the Louisiana Supreme Court remanded the case and gave the trial court the option of amending the court minutes to reflect the change in sentence without bringing the inmate to court. The court stated that the district judge retains the discretion to vacate the sentence originally imposed and to resentence the inmate in open court. *Harris* allowed ministerial corrections of the record in instances where the trial court failed to impose special restrictions required by law. However, the trial court has some discretion in setting the probation supervision fee, as it can impose a fee between twenty and one hundred dollars per month. Therefore, if the trial court opts to assess the minimum fee required by law, it can correct the sentence in accordance with the procedures set forth in *Harris*. However, if the trial court wishes to set a higher fee, the trial court should vacate defendant's sentence and resentence him in open court. Therefore, although we affirm the defendant's conviction, we must remand the case to the trial court with instructions

3

> to set a monthly probation supervision fee to be paid in accordance with article 895.1(C).

*State v. Iles*, 96-256 (La.App. 3 Cir. 11/6/96); 684 So.2d 38 at 40-41.

> Likewise, we remand for the trial court to impose and set the amount of a supervision fee. If the trial court sets the amount at the minimum fee, the trial court can correct the sentence by following the procedures set forth in *Harris*. If, however, the trial court wishes to set a higher fee, the sentence must be vacated and the Defendant resentenced in open court.

*State v. Bey*, 03-277, pp. 12-13 (La.App. 3 Cir. 10/15/03), 857 So.2d 1268, 1276-77.

*See also State v. Johnson*, 04-1266 (La.App. 3 Cir. 2/2/05), 893 So.2d 945.

In accordance with the jurisprudence set forth above, the present case is remanded for the trial court to impose a supervision fee as a condition of the defendant's probation. The trial court should follow the procedure set forth in *Harris* if it imposes the minimum supervision fee. If, however, it chooses to impose a higher fee, the trial court must vacate the sentence imposed and resentence the defendant in open court.

Additionally, the minutes of sentencing are in need of correction. First, the minutes incorrectly state that the trial court imposed a probation supervision fee of $55.00 per month. As stated above, the trial court failed to specify this fee. Thus, the trial court is instructed to amend the minutes of sentencing to delete the statement that the trial court imposed a probation supervision fee of $55.00 per month.

**ASSIGNMENT OF ERROR NO. 1**

In his first assignment of error, the defendant contends the state failed to prove criminal negligence beyond a reasonable doubt. The defendant asserts the sole issue before this court is whether his actions on the evening of November 20, 2004 constituted criminal negligence.

4

The defendant was found guilty of negligent homicide, which is "the killing of a human being by criminal negligence." La. R.S. 14:32. "Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La. R.S. 14:12.

> The State is required to show more than a mere deviation from the standard of *ordinary care* to establish proof of criminal negligence. *State v. Jones*, 298 So.2d 774 (La.1974). The negligent homicide statute proscribes conduct that goes beyond carelessness, mistake, error in judgment or omission of duty. *State v. Fenner*, 94-1498 (La.App. 4 Cir. 11/16/95), 664 So.2d 1315[, *writ denied*, 95-3001 (La. 4/29/96), 672 So.2d 679]. It is more than the mere failure to do something which a reasonable and prudent man would do, or the mere doing of something which a reasonable and prudent man might not do, *on cool reflection*, after considering the degree of harm likely to follow. Further, the "consequences" alone do not determine the criminal culpability of the actor.

*State v. Bowie*, 95-795, p. 2 (La.App. 3 Cir. 11/13/96), 684 So.2d 68, 70, *writ granted on other grounds*, 96-2987 (La. 1/31/97), 687 So.2d 369.

> In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984).

*State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170.

## EVENTS SURROUNDING THE SHOOTING

The state had the burden to prove the defendant's conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances when he fired his gun. There were no witnesses to the events that occurred at approximately 5:30 p.m. on November 20, 2004, other

5

than Roy and the defendant. The state introduced the statement given by the defendant to Detective Schaub on November 22, 2004.

In his statement, the defendant indicated he and Roy left the Knoll camp on a four-wheeler between 2:30 and 3:00 p.m. to go hunting. On the way, the four-wheeler ran out of gas. The two then proceeded on foot toward the slough and separated when the defendant pointed out the ladder stand, the "Eiffel Tower," from which Roy would be hunting. The defendant then told Roy where he was going and headed into the field toward the location of his climbing tree stand.

The defendant got to his deer stand between 3:00 and 3:15 p.m. He remained on the stand for approximately twenty minutes then walked to the tree line and followed it to the corner of the field, where he checked corn he had previously put out to attract deer. The defendant then proceeded to walk toward the Eiffel Tower. However, he stopped at a location where he thought he could see deer coming out of the slough.[2] As soon as he arrived at that location, the defendant called Roy and Roy informed the defendant that he saw the back of a deer walking on "this side of the slough" and told the defendant to stay in the field, then hung up.[3]

The defendant was subsequently questioned, as follows, by Detective Dan Schaub of the Avoyelles Parish Sheriff's Office regarding what he saw when he fired his gun:

> Jake: So I stayed and um. I stayed for I'm not sure, um, a little while, I mean, twenty thirty minutes you know and um I seen him walk him walk out.
>
> [Detective] Dan [Schaub]: You seen.

---

[2]From that location, the defendant could not see the Eiffel Tower.

[3]The slough ran along the side of the Eiffel Tower and into the field. From the Eiffel Tower, Roy looked into the slough.

6

Jake:  I seen, I seen, I seen, he had a shirt on, Kain had a camoflauge (sic) shirt on with a white shirt and um.  I thought it was the underneath of a deer and I seen the deer, I seen the deer go back.

Dan:  Ok you seen it with your eyes.

Jake:  With my own eyes, not scope, gun down to my side, I seen it.  And um I told myself, I told myself, I said I'm not gonna shoot right now, I said, because it might be, it's just not right, it's not right.  I don't know, I don't know what it is.  I told myself that.  Sure enough he turned broad, he turned broadside and I don't know if Kain was ducking down, I don't know what he was doing.

Dan: Ok.  I mean just relax, Jake it's ok.  Alright, you said something very important, ok.  You said that you had seen Kain and he was wearing camoflage (sic) with a white shirt, where did you see him, was it by his stand, was it in the slough.

Jake:  He was walking out into the field.

Dan:  So he's crossed over the bob (sic) wire fence that's there and you'd seen him when he got on your side of the tree stand, your side of the tree line.

Jake:  He must have been looking at me, he had to have been because his white was facing towards me and a little while later he turned and I guess maybe he seen the deer and he was bent down, but I when I seen him I knew I knew that it wasn't a person or nothing like that cause he was bent over you know.

Dan: Ok, just relax.  I know it hurts.  Are you looking through the scope now are you still doing this visually with you[r] own two eyes.

Jake:  Looking through, I mean I'm looking with my own two eyes.  As soon as he turns broad, broadside.

Dan:  Who's, who's, what are you talking about turning broadside.

Jake:  As soon as he turns.

Dan:  Who's the he that I'm talking about.

Jake:  Kain.

Dan:  Ok.

Jake:  I picked up my gun and just aimed for him and I shot.

Dan:  Ok.  And then after, then after you shot what happened.  What were you shooting at?

Jake:  I was shooting at a deer.

Dan:  Ok, and what did you see when you shot?

Jake:  A deer.

Dan:  What part of the deer did you see?

Jake:  I seen the white, underneath, underneath the white.  I mean the white on the deer was underneath, you know and knew I didn't see the underneath of the deer so I thought it was the neck.

Dan:  Ok.

Jake:  And when he turned broadside, I just I knew I aimed for the front of it.

Dan:  Ok.  Did you have a picture in your scope of what you shot at.

Jake:  Muttering . . . .

Dan:  A visual picture, what was the visual picture that you saw when you shot?

Jake:  I saw.  I just seen the white with just leaning down, I just knew, I just knew it was a deer, I never thought it would be, I never thought it would be him, I never just thought it would be him.

Dan:  Ok, then you shot, then what were your actions after you shot?

Jake:  I wa[s], I just, I knew the hunting channel and I knew everything I knew they always just said give it, give it time to die down, you know so I waited about five minutes and um, so I walked towards him slow.

        . . . .

Dan:  Ok, hold on a second.  Did you, when you shot through your scope, did you see anything after you shot.

Jake: No.  I didn't see.  I didn't see nothing fall, I didn't see nothing run it was just, it was just like I shot at nothing.  I thought either two things, I though[t] either I dropped it dead or I plainly missed it and he just ran going you know, just took off gone.

        . . . .

8

Dan: After the five minutes then what did you do?

Jake: Started to walk towards him, walked about ten yards, fifteen yards, I seen, I swear I swear I seen the deer take off.

Dan: To which direction now.

Jake: Right by Kain, right by Kain. Kain.

The defendant then discovered Roy's body.

Upon discovering Roy's body, the defendant dropped his gun and turned Roy over, as he was face down in the water. The defendant then pulled Roy two feet, but abandoned the effort because Roy was too heavy. The defendant then ran to the camp. No one was at the camp, so he got on a four-wheeler and drove toward the location of other hunters.

The defendant first encountered Blake Knoll and Lee Clay. The defendant indicated that at that time, he was scared and could not talk. Knoll and Clay finally asked the defendant where Roy was and the defendant responded, "I shot him." Knoll then took the defendant back to the camp. Once back at the camp, Eddie Boy arrived. Eddie Boy, Clay, and the defendant then drove to Roy's location. At that time, Eddie Boy checked Roy's pulse. After determining that Roy was dead, the defendant returned to the camp.

The defendant was subsequently questioned by his father, Mike DeSoto, who was present at the interview at the Avoyelles Parish Sheriff's Office, as follows:

Mike: Did you uh, you said whenever you uh looking in the direction of the 4-wheeler to where you expected the deer to come from you saw Kain.

Jake: I see, no, I see, yeah I seen a deer, but I mean I seen the white and it was Kain. That's what I seen cause he was wearing a white shirt.

9

Mike: When you, but did you, when you seen it did you know it was Kain.

Jake: No, no sir. I never expected it to be Kain.

Mike: But earlier you were saying that you saw Kain, now now that you know it's Kain but you didn't know it was Kain at the time.

Jake: No sir, I didn't.

The questioning by Detective Schaub continued as follows:

Dan: Ok, and I want to clear up one more thing, when you said earlier before you shot that you saw Kain, was it Kain you saw, was it a deer that you saw I need to clear that up, I don't need to know what you know now but at that time what were you thinking that you saw?

Jake: I seen a deer.

Dan: Ok, did you see Kain at any time from off his stand and walk left to his left the slough back to where you found Kain.

Jake: No sir.

The defendant did not know the power of the scope on the rifle he used.

In support of his statement that he shot at a deer, the defendant called Candice Marcotte, his girlfriend at the time of the shooting, to testify. Marcotte testified that she spoke with the defendant on the date of the incident at 5:20 p.m. The two spoke for ten to fifteen minutes then the defendant hung up on her in mid-conversation, saying he saw a deer.[4] Marcotte testified that the defendant never told her that Roy had called the defendant on his cell phone to inform him that Roy saw a deer. However, Detective Schaub testified that phone records indicated that the defendant

---

[4]Marcotte and the defendant had been involved in a disagreement because she wanted to spend the evening with the defendant. Marcotte was upset; however, she testified that the defendant was not upset and did not show signs that he cared she was upset. Marcotte and the defendant phoned each other several times throughout the day.

called Roy at 5:18:45 p.m. and the call lasted for three seconds. The defendant then called Roy again at 5:19:07 p.m. and the two spoke for forty-nine seconds.[5]

As noted earlier, after the defendant shot Roy, he encountered Clay, Blake, and Eddie Boy. All three men testified regarding what they knew about the events concerning Roy's death. Clay testified that he heard a shot between 5:15 and 5:25 p.m. Approximately five minutes later, he heard a loud yell. Subsequently, Clay left his deer stand and Knoll picked him up. When returning to the camp, Clay and Knoll encountered the defendant. Clay testified that the defendant had a look on his face that Clay had never seen on a human before. The defendant was in shock and disbelief and said Roy was dead. Clay further testified that the defendant could barely speak. Clay, along with Knoll and the defendant, then went back to the camp and Clay called the police. Clay testified that the defendant indicated he thought he was shooting at a deer. However, Clay noted these were not the defendant's exact words. Clay further testified that Eddie Boy returned to the camp and then the group went to Roy's location. When the group arrived at Roy's location, Roy was laying on his back and Clay knew Roy was dead upon seeing him.

Blake testified that the defendant was his brother-in-law. He encountered the defendant after Roy was shot. At that time, the defendant was in a state of shock and had a look on his face that Blake had never seen before. Blake testified that the defendant looked like he had seen a ghost and could not speak at that time. Blake drove the defendant back to the camp. Blake asked the defendant what had happened and the defendant responded, "he wasn't wearing any orange."

---

[5]The phone records of the defendant were identified as State Exhibit 10 and those of Roy were identified as State Exhibit 11.

11

Eddie Boy testified that he heard a shot fired at 5:25 p.m. Five minutes later, he saw a deer in the right of way that was visible from his tree stand. Eddie Boy did not shoot at the deer because, although he was using the scope on his gun, he could not determine from fourteen feet up in his deer stand whether the deer was a buck or a doe. He further testified that he could not have seen the deer's white belly from his point of view in the deer stand. Twenty minutes after he heard the shot, Eddie Boy left his stand to return to camp. Eddie Boy testified that when he got back to the camp the defendant was there and was crying heavily. He heard the defendant say "I thought it was a deer or it supposed to be a deer, it was supposed to be a deer, was what I heard."

Bruce Beauregard testified that he owned the land where the defendant and Roy were hunting. At dusk, Beauregard heard a shot fired. At that time, he was at his daughter's house, which was down the street from his home. Beauregard then heard a scream that sounded like "someone had their heart ripped out."

**WEATHER**

Several witnesses testified regarding the weather conditions on November 20, 2004. Detective Schaub contacted a meteorologist to determine what weather conditions were like that day. A weather report prepared by Tom Konvicka from KALB television read as follows:

> Weather conditions on November 20, 2004, were characterized by rain, cloudy skies and mild temperatures. Rainfall amounts in Avoyelles were generally between 0.50 and 1.50 inches, with 0.92 inches measured five miles south of Simmesport and 1.00 inches at Plaucheville. Temperatures hovered in the upper 50s to the middle 60s for the day. Fog was also observed. Sunrise occurred at 6:42 A.M. and sunset at 5:09 P.M.

> The source of this information is records maintained by myself as a full-time professional meteorologist and consultant.

12

Detective Schaub testified that when he arrived at the scene it was dark, it had been raining for most of the day, and there was a "little bit of fog." Clay testified that it was a very dark, dreary, gloomy day and was very overcast. However, he did not recall it being foggy or a mist or haze falling. Eddie Boy testified that it was a rainy, hazy, and very dreary day. There was, however, no fog.

**VEGETATION**

The defendant shot Roy from across a field and Roy fell into a slough. Accordingly, there was testimony presented regarding the amount of vegetation in the area at the time of the shooting and how the vegetation, as shown in photographs taken after the shooting, had changed.

Clay testified that he could not determine what the weed cover in the area was because it was dark, however, there was visible weed cover in the slough that night. He testified that coffee weed was "all in" the slough along with green vegetation. There was also water in the slough. Clay then testified that he did not try to distinguish what vegetation was coffee weed. He further testified that the green vegetation and coffee weed was almost to the top of his hip boots and the water was about three and a half feet deep. Clay then testified about the number of four-wheelers that entered the area near Roy's body. He agreed that there were several trips to and from the camp to the area where Roy was located and sixteen to twenty four-wheelers drove across the line of fire; thus, breaking down any coffee weed in that area. Clay further testified about the four-wheelers parking in the area two to four feet from Roy. Although Clay was shown Defense Exhibit 1,[6] the area where the four-wheelers parked was not particularly described for the record.

---

[6]Defense Exhibit 1 is a photograph looking toward the area where Roy was found. The photograph was not taken from the exact angle the shot came from.

Dr. Mayeux testified that there were six to eight inches of water in the area of the slough where Roy was found and green vegetation four inches above the water. However, there was no coffee weed in the slough. Dr. Mayeux agreed that he would have been in the fifth group that went to the slough that night, and when he arrived at the scene at approximately 7:44 p.m., a line of fire had not yet been determined.

Russell Dauzat, a former agent with the Department of Wildlife and Fisheries, went to the scene on November 20, 2004, arriving at 6:40 p.m. Dauzat testified that Roy was found in eight inches of water and there was Johnson grass, which was a little above his knees, in the area. Dauzat further testified that the four-wheeler he drove did not cross the line of fire. However, he did not know about the other four-wheelers that went to the scene that night.

Detective Schaub testified that there was green vegetation in the slough were Roy was, but he could not say if there were coffee weeds in the area. Detective Schaub did, however, testify that there were coffee weeds left of the tree line. The green vegetation was above the water in the slough. Detective Schaub further testified that every time a vehicle parked near Roy's body, the vehicle drove across the line of fire and any cover had been "matted" down. Detective Schaub agreed that there were five trips made to and from the camp on various four-wheelers.

Detective Schaub testified that the vehicles depicted in Defense Exhibits 3 and 4, which were photographs taken on November 21, 2004, had been driven to the area before the pictures were taken. On November 22, 2004, the day Detective Schaub took the photograph from the location of the shell casing toward the location of Roy's body, any weeds that had previously been in the area were gone. Also, most of the vegetation around the body was changed in the photographs taken on December 3,

2004. Defense counsel showed the jury the place the various four-wheelers that entered the area surrounding Roy's body were parked. However, defense counsel did not refer to which photograph Detective Schaub was looking at or set forth for the record the area to which Detective Schaub referred.

**PHOTOGRAPHS, MEASUREMENTS, AND SKETCHES**

Detective Schaub returned to the scene on November 21, 2004, the day following the shooting. At that time, Detective Schaub took photographs of the area, drew sketches, and looked for the shell casing.[7]

Detective Schaub returned to the scene again on November 22, 2004, to look for the location from which the defendant fired the gun. On that day, Detective Schaub found the shell casing. The location at which the casing was found is depicted in State Exhibit 6.

Detective Schaub also took measurements at the scene. He determined that distance between the location of the cartridge to and the location of Roy's head was two hundred forty-six feet six inches. He also took a photograph from the point he found the shell casing toward the area where Roy's body was found. The photograph

---

[7]State Exhibit 9 A is a photograph of the area where Roy's body was found. Detective Schaub was walking from the "shoot point" toward Roy's body and was in the area where the slough starts when he took the photograph. State Exhibit 9 B is a photograph of the area where Roy was found, taken from a point near the slough. State Exhibit 9 C is a photograph taken from the slough toward the area of the Eiffel Tower.

Detective Schaub also took various other photographs on November 21, 2004. Defense Exhibit 1 is a photograph looking toward where Roy was found, and it was not taken from the exact angle from which the shot originated. Defense Exhibits 2 and 3 were also discussed. Defense Exhibit 4 is a photograph taken from behind where Roy was found looking toward the location where the shot originated. Defense Exhibit 5 is a photograph of the same thing depicted in Defense Exhibit 4, but the camera was closer to the area where Roy was found. Defense Exhibit 6 is a zoomed photograph showing the halfway marker between the area where the shot was fired and the area where Roy's body was located. Defense Exhibit 7 is a photograph in the line of fire looking toward where Roy was found.

Defense Exhibit 8 represents two photographs that were taken on December 3, 2004.

was admitted as State Exhibit 8. Detective Schaub also determined that it was ninety-seven feet from the shell casing to the Eiffel Tower from which Roy was hunting. Additionally, it was two hundred ten feet from the Eiffel Tower to Roy's head.

Detective Schaub and Detective Keith Fennell, an employee of the Rapides Parish Sheriff's Office, went to the scene on November 29, 2004. At that time, Detective Fennell took photographs and measurements of the area. After a conversation with Mike Stelly, who is employed at the North Louisiana Crime Lab, Detective Fennell chose a location eight feet to the left of the shell casing and two feet forward to set up his tripod to take pictures back toward the former location of Roy's body. Detective Fennell also prepared sketches from measurements he took at the scene.[8]

Detectives Fennell and Schaub returned to the location of the shooting on December 3, 2004. At that time, Detective Fennell took photographs through a scope that was the same make and model as that on the gun used by the defendant. The photographs were taken from the location of the shell casing. The photographs were marked as State Exhibit 23 L, which was taken at 5:16 p.m., and State Exhibit 23 M, which was taken at 5:17 p.m.[9] The photographs were taken under conditions different

---

[8]The measurement was depicted in State Exhibit 23 C. State Exhibits 23 D and E are photographs taken from the location of the shell casing toward the Eiffel Tower stand. Detective Fennell testified that the legs of the Eiffel Tower were barely visible in the photographs. Detective Fennell then climbed the Eiffel Tower and took photographs, which were labeled as State Exhibits 23 F and G, from the stand toward the location where the shell casing was found. A man was standing at the location of the shell casing. Detective Fennell next took a photograph from the Eiffel Tower toward the area where the Defendant's tree stand was located. The photograph was marked as State Exhibit 23 H. A photograph of the view from the base of the Eiffel Tower toward the slough was introduced as State Exhibit 23 I.

[9]State Exhibit 23 L depicts a person in the cross-hairs of the scope. The photograph was taken with the scope set at six and a quarter power and Detective Fennell was holding the camera "behind it attempting to take the pictures." State Exhibit 23 M is a photograph taken without the scope and depicts a person standing across the field.

from those that existed on November 20, 2004. The state asserted the purpose of introducing the photographs was to demonstrate that a picture that accurately depicted the scene could not be taken.

Stelly conducted an ejection pattern test at the crime lab on December 16, 2004. The ejection pattern did not match the distance Detective Fennell used to calculate the location from which he took photographs on November 29, 2004. Fennell took the photographs eight feet from the shell casing and the ejection pattern test revealed the pictures should have been taken four feet from the location of the shell casing.

Detective Schaub, along with Detective Fennell, took photographs of the Beauregard field by helicopter on December 9, 2004. At that time, the field was flooded. Detective Schaub used those photographs to show the jury the movements of the defendant and Roy on November 20, 2004 and the movements of the defendant and Detective Schaub on November 22, 2004. However, the directions are not clear from the record.

Dauzat took measurements and made a sketch of the scene. The sketch was introduced as State Exhibit 18. Dauzat's measurements were the same as those made by Detectives Schaub and Fennell.

**GUN**

There were several witnesses who testified regarding the gun used by the defendant and the power setting on the scope when the defendant fired the gun. In photos introduced into evidence, the power setting was on 6.5.

The gun used by the defendant was in the slough and Dauzat discovered the gun when he stepped on it. Dauzat did not recall and did not record the power setting

on the scope to when he found the gun. However, he testified that he did not alter the power setting on the scope when he had the gun in his possession. He later admitted that it was possible that the setting could have been changed when he stepped on the gun. Dauzat later testified that it was very possible that he stepped on the stock of the gun. After discovering the gun, Dauzat gave the gun to Agent Callegari to unload. Agent Callegari was not called as a witness at trial.

Blake, Eddie Boy, and Clay were also questioned regarding the gun the defendant used. Blake testified that the gun the defendant used that day belonged to him. Blake further testified that he left the gun at the camp, had neglected the gun, and that he "mostly" kept the scope on the lowest power setting. However, Blake testified that he had not used the gun in "quite awhile." Additionally, Blake had not recently sighted the gun in. Blake then agreed that any person using the gun could have changed the power setting on the scope. He further agreed that anyone else who had been at the camp could have used the gun. Blake testified that he did not make the mark on the scope near the power setting of 6.5, as depicted in State Exhibit 17 E.

Clay testified that he did not see anyone "fumble with" the scope at the scene. Clay further agreed that it was likely that four-wheelers driving to and from the camp passed over the gun the defendant used. Eddie Boy was also unaware of the usual power setting on the scope. The scratch on the power setting of the scope meant nothing to him. Eddie Boy further testified that the gun belonged to his brother Jonathan.

Detective Fennell testified that he had no knowledge of the power setting of the scope when the gun was found. Additionally, he did not know if the scope was set

to the eye relief of the defendant at the time the defendant fired the gun. Additionally, Detective Schaub testified there was no report from the point-of-aim testing that was conducted, so he could not testify as to whether the gun was "aimed specifically" at the time it was discharged.

During the testimony of Detective Fennell, the gun used by the defendant was set up in the courtroom, and jurors were allowed to look through the scope on the gun out the window of the courtroom at the first window of a gray building across the street. The power setting on the scope was set to 6.5. The state asserted the demonstration was for the purpose of "the sighting of 246 and a half feet away." The state also asserted jurors should be allowed to look through the scope for magnification purposes. Detective Fennell agreed that the demonstration was not meant to show the conditions that existed on November 20, 2004.

**DANGEROUS BEHAVIOR**

Dauzat testified that both the defendant and Roy had attended the required hunter education classes and that both had hunting licenses. Dauzat further testified that the shooting occurred at 5:30 p.m. and hunting for the day would have been over at approximately 5:38 p.m. according to published hunting pamphlets.[10] Additionally, Dauzat testified that there are ten commandments with regard to shooting at an object and one of those commandments is to "identify your target, make sure that you know what you're shooting at and what's beyond your target." Dauzat proceeded to testify that not wearing orange while deer hunting is dangerous. Detective Schaub testified that neither the defendant nor Roy were wearing hunter's orange on November 20, 2004.

---

[10]A hunting pamphlet was introduced as State Exhibit 19.

19

Dauzat was later asked the following:

Q.    The (UNINTELLIGIBLE) and whether or not it was a dangerous maneuver if Kain Roy went out of the area where they were hunting if we assume and it's in evidence, I'm sorry. Not assume, if the facts were that yes Kain did call Jake, when Jake was 97 feet from him and told him I see a deer in the slew, coming toward the field and Kain said he's coming toward you, stay where you are and he . . . and Kain's original stand would have been here, along the tree line by the willows, right here, Jake's I'm sorry. Where you have this drawn. If the original position of Jake Desoto's stand was here and Kain did make that phone call and say a deer is coming here and he's coming toward the field, stay in your stand, would be a dangerous maneuver for Jake Desoto to get off that stand and walk to within 97 feet of a fellow hunter with a rifle without telling him?

. . . .

A.  Yes, it would be dangerous.

Clay testified that one could safely shoot from where the shell casing was found to the area where Roy was found without hitting anyone in the Eiffel Tower.

DEFENDANT'S ARGUMENT

In support of his argument that the state failed to meet its burden of proof, the defendant cites *State v. Jones*, 298 So.2d 774 (La.1974). Therein, the supreme court discussed La.R.S. 14:12 and the Reporter's Comments thereto, as follows:

> The Reporter's Comment to this section states, 'Criminal negligence, in fact, corresponds to the concept of 'gross negligence' in tort law. See Restatement of the Law of Torts (1934) ss 282--284, 500.'
>
> Section 500 provides:
>
> 'The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him.'

20

Subsections (f) and (g) of that section provide:

. . . .

> 'Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency in that reckless misconduct requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind.'

> Under these standards it is clear that proof of ordinary negligence does not constitute proof of criminal negligence. The State is required to show more than a mere deviation from the standard of ordinary care.

*Id*. at 775-76.

The defendant argues that there was no evidence that he was intoxicated during the incident in question, that he and Roy were engaged in horseplay, or that he was attempting to startle or scare Roy. The defendant further argues that he had no reason to believe that, after Roy told him a deer was following the slough from the woods to the field, Roy would descend from the safety of the Eiffel Tower and enter the field and go into the slough at the very place the deer was supposed to be. The defendant asserts that Dauzat agreed that such a maneuver by Roy, without hunter's orange at dusk, would be a highly dangerous thing to do.

21

The defendant next quoted portions of his statement to police wherein he stated that he "seen the deer" with his "own eyes" and was "shooting at a deer." The defendant then asserts that it is "abundantly clear" from his statement that he "thought he was shooting at a deer. . . ." The defendant contends it is unreasonable to conclude that he "did not at all times state that he thought he was shooting a deer."

The defendant discusses *State in the Interest of S.T.*, 95 2187 (La.App. 1 Cir. 6/28/96), 677 So.2d 1071. In *S.T*, the juvenile, who was sixteen years old at the time of the incident, was adjudicated delinquent based on the commission of negligent homicide. While situated in a portable deer stand high in a tree, the juvenile fired at what he believed was a deer. When the juvenile went to retrieve the deer, he discovered he had shot and killed another hunter.

The juvenile testified that he was using a grunt call to attract deer when he heard a noise. He turned and saw a doe, but did not shoot, as only bucks were in season. Because he heard similar sounds from the same area, he looked and saw the high neck and rear end of another deer. The juvenile testified that he put the deer in the scope of his rifle and grunted again. When he saw the deer's antlers, the juvenile then shot it. The juvenile denied shooting blindly at what he heard.

In *S.T.*, the victim lay in a path, a small area clear of thickets or briars. The juvenile's deer stand, which was located approximately one hundred twenty yards from the victim, was also free of obstructions, briars, or thickets. There was no evidence that the juvenile had consumed alcohol or engaged in horseplay.

After reviewing the facts, the first circuit concluded the following:

> The child was the only witness who testified as to what he saw and did. Construing his testimony and the other evidence in the record in the light most favorable to the state, the child first saw a doe, which he did not shoot. He then saw a buck which he fixed in his scope and,

22

after seeing antlers and a deer's head and shoulder, shot at the deer. The only opposition to this otherwise unrefuted testimony is the trial court's inferences on what may have "actually" happened. Based on its own experiences, the court speculated that the boy must have shot before seeing a deer. The record does not support this conclusion. There was no evidence whatsoever tending to prove the child had not seen a deer before he fired the shot. As previously stated, the court noted the child was truthful in stating he saw a deer. There was no evidence that the child acted in any manner or conducted himself in gross deviation below the standard of care expected of a reasonable hunter in similar circumstances. While the facts certainly portray a tragic hunting accident, the record contains no evidence, including the trial court's factual findings, to support a finding of the element of criminal negligence required in a case of negligent homicide. We therefore conclude that the juvenile court was clearly in error in adjudicating the child a delinquent and finding him guilty of a negligent homicide.

*Id*. at 1074-75.

The defendant asserts that the case at bar is distinguishable from *S.T.*, in that the evidence showed that Roy specifically alerted the defendant to the presence of a deer at the intersection of the slough and the field and, thereafter, proceeded, without warning, to the exact spot resulting in a tragic hunting accident.

The defendant asserts that the wanton and reckless actions argued by the state to the jury include the fact that he left his stand on the other side of the Beauregard field and moved to a point along the wood line approximately thirty-four yards from the Eiffel Tower. The defendant asserts, however, that shooting south from that point toward the slough posed no danger to a person in the Eiffel Tower. The defendant also points out that the state cited the fact that he answered his cell phone when Marcotte called and spoke to her for several minutes before the accident. The defendant asserts that this did not constitute wanton and reckless behavior. The defendant next points out that the most serious argument the state brought up was his belief that he could see the white underbelly of a deer and shot above same. The defendant asserts that we will never know whether it was the white underbelly of a

23

deer or the contrast of Roy's lighter colored shirt with his camouflage jacket. The defendant asserts that what we do know is that Roy informed him that a deer was near the slough and that the defendant shot what he believed to be a deer with the reasonable belief that Roy was out of harm's way in the Eiffel Tower.

## STATE'S ARGUMENT

The state asserts that the jury could have surmised that the defendant and Marcotte were engaged in argumentative telephone conversations, which dealt with his decision to hunt with Roy, throughout the entire hunt. The defendant had access to Roy throughout the hunt by cell phone. The defendant left the deer stand where Roy expected him to be and walked within ninety-seven feet behind the Eiffel Tower where Roy had been hunting. The defendant called Roy, who told the defendant he saw the back side of a deer across the slough heading toward the field in the direction of the defendant's tree stand and told the defendant to stay put. Rather than calling Roy to inform Roy that he was not in the tree stand, the defendant engaged in a nine and one-half minute conversation with Marcotte. The defendant then saw the white of what he thought was a deer and shot when it turned broadside. The defendant fired a shot sometime after 5:30:10 p.m. in weather conditions described as rainy, with cloudy skies, and fog observed. The state asserts that it was "left to the jury as the trier of fact to decide whether, under those circumstances and according to his voluntary statement he actually saw Kain Roy standing in the field and later bent over or if the white of what he thought was a deer and he shot or did not know what it was and he shot."

In support of its argument, the state cites *State v. Parker*, 431 So.2d 114 (La.App. 1 Cir.), *writ denied*, 435 So.2d 433 (La.1983). In *Parker*, the defendant was

convicted of negligent homicide. The first circuit noted that for several years before the shooting, the occupants of the trailer in which the defendant lived had been subjected to a series of harassments. On numerous occasions unknown persons broke into the trailer, smashing the locks. Additionally, on one occasion, an occupant of the trailer who was patrolling outside to protect the other occupants was physically assaulted.

On the night in question, several members of the household left to run errands. While they were gone, the defendant and other persons inside the trailer were harassed by unknown individuals who were apparently attempting to break into the back door, which was cabled shut. The defendant shot through the door several times, supposedly to frighten off the assailants. A few minutes later, the defendant again heard sounds of attempted entry, this time at the front door. He again shot through the door with a thirty-eight-caliber pistol, striking the victim, who had previously left to run errands.

In upholding the defendant's conviction for negligent homicide, the court stated the following:

> The record indicates that the jury was presented with testimony by many individuals, including the victim's husband, that an aura of harassment and fear was present at the time of the shooting. The jury was also presented with the evidence that the defendant shot through a door without determining who was outside. Additionally, defendant knew that several members of the household were out, and were expected to return. A rational trier of fact could find that, although the defendant was confronted with a frightening experience, he nevertheless responded in a manner grossly out of proportion to the danger he faced. Consequently, he was guilty of criminal negligence in firing at an unknown individual through a closed door.

*Id*. at 115.

The state contends that like the defendant in *Parker*, the defendant in the case at bar shot without knowing what he was shooting, although he knew Roy was hunting in front of him.

The state also attempts to distinguish *S.T.*, 677 So.2d 1017. The state asserts that in *S.T.*, the juvenile was told that dogs and drivers would be used to run deer toward the hunters. The juvenile chose his own deer stand. It was daylight. The path where the juvenile fired was clear. The juvenile saw a doe, but did not shoot. Thereafter, the juvenile saw a buck with six to eight antler points. The juvenile then shot, killing the victim who was a dog driver.

The state then asserts that it is noteworthy that the defendant, in his statement to police, initially said he saw the white of what he thought was a deer and told himself, "I'm not gonna shoot right now, because it might be, it's just not right, it's not right; I don't what it is."

DEFENDANT'S REPLY

In a reply brief, the defendant asserts that the state implies that his movement from his original location on the east side of the Beauregard field to the point where he fired his gun, some ninety-seven feet from the Eiffel Tower, somehow put Roy in more danger and that his failure to advise Roy of his movement was negligent. The defendant argues that a review of the sketches completed by Dauzat and Detective Fennell reflect that the state's argument is a distortion of the facts. The defendant further points out that the Eiffel Tower was ninety-seven feet into the woods in a southwesterly direction from the point he fired his gun, and the line of fire was in a southeasterly direction. Therefore, he could have in no way endangered Roy had Roy stayed in the Eiffel Tower or traveled toward the road shown in the sketch.

26

The state, in its brief, asserts that the defendant stated, "he saw Kain coming to the field, wearing white and a camouflage jacket." The defendant also stated that "he saw the white of what he thought to be a deer, aimed his rifle, looking through the scope. . . ." The defendant then stated, "Kain turned, stooped or bent over and he shot." The state then asserts it was up to the jury to decide whether the defendant actually saw Roy "standing in the field and later bent over or if the white of what he thought was a deer and he shot or did not know what it was and he shot."

We find that the jury could have believed, based on the defendant's statement, that the defendant actually saw Roy enter the field and later fired his gun at either Roy or a deer. If the defendant saw Roy in the field, his act of firing the gun, even at a deer, would have been a gross deviation below the standard of care expected of a reasonably careful person under like circumstances. The jury, based on the evidence, could have concluded that the defendant shot without clearly identifying his target. This also would have been a gross deviation below the standard of care expected of a reasonably careful person under like circumstances. When viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found proof beyond a reasonable doubt as to each essential element of the crime charged. When reviewed under the *Jackson* standard, there is sufficient evidence to affirm the conviction.

**ASSIGNMENT OF ERROR NO. 2**

In his second assignment of error, the defendant contends his sentence is excessive and illegal. Louisiana Revised Statute 14:32(C) provides for sentencing as follows: "Whoever commits the crime of negligent homicide shall be imprisoned

27

with or without hard labor for not more than five years, fined not more than five thousand dollars, or both." The defendant was sentenced to serve five years without hard labor, with the last two years of the sentence suspended. The trial court further ordered that the defendant be placed on supervised probation for a period of two years upon his release from incarceration.

The standard regarding excessive sentences is well settled and this court has stated the following regarding the issue:

> The Eighth Amendment to the United States Constitution and La. Const. art. I, § 20 prohibit the imposition of cruel or excessive punishment. " '[T]he excessiveness of a sentence becomes a question of law reviewable under the appellate jurisdiction of this court.' " *State v. Dorthey*, 623 So.2d 1276, 1280 (La.1993) (quoting *State v. Sepulvado*, 367 So.2d 762, 764 (La.1979)). Still, the trial court is given wide discretion in imposing a sentence, and, absent a manifest abuse of that discretion, we will not deem as excessive a sentence imposed within statutory limits. *State v. Pyke*, 95-919 (La.App. 3 Cir. 3/6/96), 670 So.2d 713. However, "[m]aximum sentences are reserved for the most serious violations and the worst offenders." *State v. Farhood*, 02-490, p. 11 (La.App. 5 Cir. 3/25/03), 844 So.2d 217, 225. The only relevant question for us to consider on review is not whether another sentence would be more appropriate, but whether the trial court abused its broad discretion in sentencing a defendant. *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
>
> The fifth circuit, in [*State v.*] *Lisotta*, [98-646 (La.App. 5 Cir. 12/16/98),] 726 So.2d [57] at 58, [*writ denied*, 99-433 (La.6/25/99), 745 So.2d 1183], stated that the reviewing court should consider three factors in reviewing the trial court's sentencing discretion:
>
> 1. The nature of the crime,
>
> 2. The nature and background of the offender, and
>
> 3. The sentence imposed for similar crimes by the same court and other courts.

*State v. Whatley*, 03-1275, pp. 5-6 (La.App. 3 Cir. 3/3/04), 867 So.2d 955, 958-59.

28

In the present case, at the defendant's sentencing hearing, the trial court indicated the defendant was a nineteen-year-old first felony offender who had completed his GED. The trial court further noted that the defendant was employed with Jeansonne's Metal Building Company and had attended addictive disorder clinics for alcohol use. The trial court went on to find that the defendant was in need of correctional treatment, that a lesser sentence would deprecate the seriousness of the offense, and the defendant used a dangerous weapon in the commission of the offense. The trial court then noted that the defendant's criminal conduct was the result of circumstances unlikely to reoccur and he was "particularly likely" to respond affirmatively to probationary treatment. The trial court then made the following comments:

> The victim's life was lost. This can never be corrected. The question for the court that I have is whether to impose a maximum sentence and hope that after it's served the system will not hear from you again or impose a sentence that will attempt to help salvage your life, but knowing that you will always have to live with what has happened. If you are sentenced to serve a maximum of five years at hard labor you would probably be out in half that time. You'd be merely passing your time away in prison. However, if you are to be given probation only it would be (UNINTELLIGIBLE) with the severity of the offense.

> The court is going to impose both incarceration and probation. The incarceration is going to be without hard labor which means that you will serve in the parish facility.

> In your letter to the court you've shown remorse. You're (sic) relatives have expressed support for you and a willingness to help. In a parish jail setting that will be easier for them to help you. The court also feels that you are in need of supervision and if the probation will give you the opportunity to have it.

The defendant argues that the trial court's finding that he was in need of correctional treatment is inconsistent with its conclusion that he would respond affirmatively to probationary treatment and his criminal conduct was the result of

29

circumstances unlikely to recur. The defendant next argues that the aggravating factors set forth in La.Code Crim.P. art. 894.1(B) do not exist in this case; yet the trial court commented on the defendant's use of a dangerous weapon as though it was a factor used in subsection (A) of art. 894.1 and used that fact to determine whether to impose imprisonment. The defendant asserts that to consider the use of a weapon as an aggravating factor makes no sense when the gun was used for the lawful activity of hunting and the charged offense does not involve intent.

The defendant then cites *State v. Green*, 418 So.2d 609 (La.1982). Therein, the defendant was convicted of two counts of negligent homicide and was sentenced to three years at hard labor on each count, to run concurrently. The defendant, whose blood alcohol level was determined to have been .18% at the time of the accident, failed to negotiate a curve and hit a vehicle occupied by a seventeen-year-old couple. The couple died as a result of the accident. The court found the defendant's sentences were not excessive.

The defendant attempts to distinguish *Green* on two grounds. First, two young people died a horrible burning death in *Green*. Second, the defendant in *Green* was engaged in dangerous criminal conduct, operating a motor vehicle while under the influence of alcohol. The defendant argues that in the case at bar he was engaged in hunting, a lawful activity promoted by the State.

The state argues that the defendant's reference to his conduct as being an activity promoted by the State of Louisiana is far-reaching. The state asserts that, although the State of Louisiana promotes hunting seasons and wildlife hunting, it does not condone the careless and reckless use of firearms while hunting and especially not the shooting and killing of a human.

30

The state asserts the trial court addressed both mitigating and aggravating circumstances in the case at bar. Additionally, the state argues La.Code Crim.P. art. 894.1 "does not distinguish the context in which the dangerous weapon is used to be considered an aggravating factor." Furthermore, the jury found the defendant criminally negligent, and the trial court considered the fact that Roy lost his life and this fact could never be corrected.

In support of its argument that the defendant's sentence is not excessive, the State cites *State v. Robinson*, 423 So.2d 1053 (La.1982). In *Robinson*, the defendant was convicted of negligent homicide and sentenced to five hears at hard labor. On appeal, the defendant argued that the trial court erred in failing to follow the sentencing guidelines set forth in La.Code Crim.P. art. 894.1. On appeal, the supreme court noted the following:

> The court found that the defendant had abused his considerable position and reputation in the community, that he had "shown a disregard of law and ethics" most clearly demonstrated by "being dishonest enough to let another man take the wrap (sic) for the crime," that he had killed the victim due to jealousy which might well reoccur in the future. At the same time the court acknowledged that the defendant had held many prominent positions and he had been well respected in the community; the court noted his excellent references. In the court's view, however, those considerations did not outweigh the fact that "[h]e killed Eartha Lee, and then he tried to throw the blame on an innocent man." Finding that the defendant's imprisonment would not be an excessive hardship to the family, the court stated that a lesser sentence would deprecate the seriousness of the crime. The record reflects that the trial court adequately considered the guidelines in particularizing the sentence to the defendant; the judge's determinations and considerations appear in the record. This assignment lacks merit.

*Id*. at 1062. The court went on to find that the defendant's sentence was not excessive.

The state also cites *State v. Rachal*, 97-642 (La.App. 3 Cir. 10/29/97), 703 So.2d 678, *writ denied*, 97-2978 (La. 3/27/98), 716 So.2d 884. (S.Br.p. 14). In

*Rachal*, the defendant was convicted of negligent homicide and sentenced to serve five years at hard labor. After the defendant stopped his vehicle in the roadway to speak to someone, the victim, who had been driving behind the defendant, got out of his vehicle and approached the defendant's car. In a statement, the defendant indicated that the victim attacked him and he got a gun out of the glove compartment and shot the victim. The defendant later testified the two struggled over the gun and it went off.

On appeal, the defendant argued that the trial court erred by failing to sufficiently articulate its reasons for sentencing as required by La.Code Crim.P. art. 894.1. This court noted the following regarding the trial court's compliance with art. 894.1:

> The trial court focused on the fact that the defendant's crime had resulted in the taking of a human life. Although the trial court noted mitigating factors such as the quality of the defendant's present life, the court sentenced him to serve the maximum sentence. The trial court complied with Article 894.1. Negligent homicide by definition results in the death of a person, but there is a difference when the instrumentality of death is a gun. Guns are designed to kill. Thus, other reasons for imposition of the maximum statutory sentence existed besides the fact of a death. The sentencing judge believed that a lesser sentence would deprecate the seriousness of the defendant's crime. We conclude that the trial court's articulation of its reasons for sentence was sufficient.

*Id*. at 681. This court went on to find the defendant's sentence was not excessive.

The state further cites *State v. Maze*, 596 So.2d 218 (La.App. 3 Cir.), *writ denied*, 604 So.2d 963 (La.1992), for the proposition that a trial court is not required to render a suspended sentence or probation for a first felony offense, but may consider whatever factors and evidence which are deemed important to a determination of the best interest of the public and the defendant. The State next points out that the pre-sentence investigation report contained evidence of other

careless and reckless behavior by the defendant against Roy and the trial court properly considered that information pursuant to *State v. Cottingin*, 496 So.2d 1379 (La.App. 3 Cir. 1986).

The state also cites *State v. McFerson*, 583 So.2d 516 (La.App. 3 Cir.), *writ denied*, 588 So.2d 113 (La.1991), wherein the defendant brought a gun to a nightclub and while moving the gun from the back to the front of his pants, someone bumped the defendant and the gun went off, killing the victim. The defendant was convicted of negligent homicide and sentenced to three years at hard labor.

On appeal the defendant argued that his sentence was excessive. This court noted the following:

> Prior to sentencing defendant to three years at hard labor, the trial judge reviewed a pre-sentence investigation report prepared at his request, which contained both aggravating and mitigating factors. The judge specifically referred to this report and other factors when he pronounced sentence. The trial judge was aware of the fact that this was McFerson's first conviction. He specifically considered the fact that McFerson is nineteen years old and that he is serving in the United States Army in which he has been noted to be a good worker for the past one and one-half years. The judge also considered several letters which McFerson submitted stating that he was a conscientious, good worker and all around person of notable character. While the trial judge had no doubt that McFerson was "a good man," he felt that "guns, whiskey, and honkey tonks are a deadly formula."

*Id*. at 520. This court then found the defendant's sentence was not excessive.

The state further alleges the trial court did not impose the maximum sentence upon the defendant, as there was no fine imposed.

In reply, the defendant asserts that other evidence of the defendant's behavior toward Roy had been previously excluded from evidence and that the trial court "specifically noted in chambers to counsel for the State and the defense that he would not consider same in sentencing" and the defendant did not have to present evidence

33

to refute the allegations of carelessness. Additionally, at the hearing on the defendant's Motion to Reconsider Sentence, the trial court specifically stated that the evidence referenced by the state played no part in its consideration.

Regardless of whether comments by the trial court were contradictory, it chose to impose a term of imprisonment combined with probation and "even where a defendant is a first offender, the district court is not required to suspend or probate the sentence." *State v. Garner*, 99-160, p. 5 (La.App. 3 Cir. 6/2/99), 741 So.2d 771, 774 (citations omitted). Additionally, any remarks by the trial court regarding the fact that a gun was used in the offense were proper according to *Rachal*, 703 So.2d 678.

The trial court did state, at the hearing on the defendant's Motion to Reconsider Sentence, that other incidents involving the defendant and Roy were not considered at sentencing.

*Robinson*, 423 So.2d 1053, a case cited by the state, is distinguishable from the case at bar. The defendant in *Robinson* shot the victim due to jealousy and placed blame on someone else. The case at bar is also distinguishable from *Rachal*, 703 So.2d 678, wherein the defendant either shot the victim or the victim and the defendant struggled over the gun. The case at bar is also distinguishable from *Green*, 418 So.2d 609, in that *Green* involved an initial offense that was a statutory violation, driving while intoxicated.

The case at bar is most similar to *McFerson*, 583 So.2d 516, wherein the victim was shot when the defendant's gun discharged while he moved it from the back to the front of his pants. The defendant in *McFerson* was sentenced to three years at hard labor. The defendant in the case at bar was sentenced to five years without hard

labor, with the last two years of the sentence suspended and the defendant to be placed on two years probation at the time he is released from incarceration.

Considering all of the factors involved, we find the trial court properly considered the sentencing guidelines in La.Code Crim.P. art. 894.1 and that the sentence imposed is not excessive.

**ASSIGNMENT OF ERROR NO. 3**

In his third assignment of error, the defendant contends there was a defect in the proceedings since a recused judge participated in the process.

The defendant filed a Motion to Recuse on January 24, 2006. Judge Mark Jeansonne signed the order of recusal on the same date. Judge William Bennett also recused himself from this matter. On January 27, 2006, the Louisiana Supreme Court appointed Judge Frank Foil to hear the matter.

The defendant asserts that on the date trial was to begin, while counsel was participating in a conference in chambers, Judge Jeansonne excused seven prospective jurors in open court, in front of the Roy and DeSoto families. Upon entering the courtroom, defense counsel objected to the actions of Judge Jeansonne.

The defendant then notes that at a hearing on his Motion for Post Verdict Judgment of Acquittal and New Trial, Judge Jeansonne's secretary, Maria Moreau, acknowledged that some prospective jurors "were excused by mail from the Sheriff's Office sending served subpoenas with a purported reason for the excuse written thereon by Sheriff's employee, 'T-Pat.'" Ms. Moreau further testified that subpoenas delivered to her are then presented to the judge. The defendant further points out that Ms. Moreau testified that prospective jurors attempt to be excused "up to the last minute."

Additionally, at the hearing on the defendant's motion, attorney Jonathan Gaspard testified that he obtained an excuse for a prospective juror via telephone request to Ms. Moreau subsequent to Judge Jeansonne's recusal, and no reason for the excuse was given. The defendant asserts that "[t]hese were clear violations of the provisions of La.C.Cr.P. Art. 783 B and C and in violation of the defendant's right to have the entire jury present at his trial."

The defendant further argues that Judge Jeansonne's act of excusing prospective jurors subsequent to his recusal was an absolute nullity in each instance and deprived the defendant of the right to a fair trial and the right to have a fair cross-section of the community as prospective jurors. In support of this argument, the defendant cites *State v. Clarke*, 03-129 (La.App. 1 Cir. 9/26/03), 857 So.2d 599. In *Clarke*, the trial judge recused herself after the defendant waived his right to a jury trial. A week later the defendant sought to withdraw his prior waiver; thus, the trial judge vacated her previous recusal order. The first circuit found that the trial judge had recused herself *ex proprio motu*; therefore, her power and authority to act in the case for any and all reasons ceased at the moment of recusal. Accordingly, the trial court's granting of the defendant's motion to reconsider his prior waiver of his right to trial by jury, as well as the trial court's vacating of its own recusal were without authority. In *Clarke*, the first circuit stated the following:

> Under LSA-C.Cr.P. art. 672, "[a] judge may recuse himself, whether a motion for his recusation has been filed by a party or not, in any case in which a ground for recusation exists." According to LSA-C.Cr.P. art. 673, a judge has full power and authority to act "**until he is recused**, or a motion for his recusation is filed." (Emphasis added). In *State v. Price*, 274 So.2d 194 (La.1973), the Louisiana Supreme Court observed:
>
> > [Louisiana Code of Criminal Procedure articles 673 and 676 are] based upon similar provisions in the Code of Civil

36

Procedure, and interpretation of the latter provisions is pertinent here. It has long been recognized in our civil procedure that once a judge is recused . . . he has no power to act (except to appoint the proper person to sit ad hoc when the law provides for such an appointment). **Any action taken by a recused judge is an absolute nullity**. . . .

In considering the particular action taken by a recused judge, our courts have made no distinction between ministerial and judicial acts. We have determined that no action may be performed by the recused judge. The theory of recusation is based upon public policy, for it is applied not only for the protection of the litigants but generally to see that justice is done by an impartial court. It is, therefore, for the sake of appearance to the general public as well as protection against the acts themselves that a judge be prohibited from any activity in a case in which he has been recused.

*Price*, 274 So.2d at 197 (Emphasis added and citations omitted). Thus, in *Price*, the state's appeal was dismissed as untimely, since it had sought and obtained an extension of time in which to file its appeal from a judge who had been recused in the case.

Applying *Price* in a civil case, this court held in *Revere v. Strain*, 02-0254 (La.App. 1st Cir. 12/31/02), 837 So.2d 137, that a judge who had recused herself could not sign an order that she had orally sustained prior to the recusal. This court noted that "the power and authority for [one] to act as judge in a particular case for any and all reasons ceases at the moment of recusal." *Revere*, 837 So.2d at 138. *See also Arcement v. Cruz*, 02-2533 (La.App. 4th Cir. 12/20/02), 836 So.2d 314, 315 ("Once a judge recuses himself or herself from hearing a case, the judge is thereafter precluded from hearing that case ever again.") Given the foregoing, it is clear that if a trial judge recuses herself from a case, the trial judge may not take any further action in that case, including that of rescinding her prior order of recusal.

*Clark*, 857 So.2d at 601-02 (emphasis in original).

The defendant then indicates that he is not suggesting that Judge Jeansonne colluded with anyone for "purposes inconsistent with the best interest of Jake." However, he asserts the appearance of impropriety took a beating in the case at bar.

The defendant alleges that part of the controversy included Judge Jeansonne's relationship with the parties. The defendant contends Judge Jeansonne stated in open court that he was close to everyone involved and it was devastating for him to have to judge.

The state contends that Judge Jeansonne did not participate in any phase of the trial of the case at bar after his recusal or once the matter was called for trial on Tuesday, January 31, 2006, as the case had not yet been called when Judge Jeansonne excused several jurors. The state further contends that *Clarke*, 857 So.2d 599, is distinguishable from the facts in the case at bar.

The state further argues that there were thirty-nine cases on the docket on January 31, 2006, and the only case there had been a recusal in was the case at bar. Although the cases on the docket are listed in preferential order, no case is officially designated to be called before the general jury pool is addressed by the judge presiding over the particular division holding trials that week. The state contends that once the jury pool has been addressed and jurors screened for exemptions or excuses, the state calls a matter for trial and the jury panel is called from the general jury pool. Any juror not selected for the case called is then returned to the general jury pool for the next case that will be called during the jury week. On the day of trial, Judge Jeansonne addressed potential jurors, stating the following:

> They should be calling the first case shortly. And we'll try to make everything go as quickly as possible.
>
> There will be a visiting judge sitting in on the first case called. What I'm going to do first this morning with everyone, I'm going to read to you general exemptions and it's to see whether or not you're qualified to serve on a jury or not.
>
> If you think after I read this list to you, if you think you do not qualify or you want to be exempt for some personal reason, then I'll ask

38

you to line up right now.  I have to try to tell you to stay, I have to try to convince you to stay, okay. . . .  I don't know exactly how long the first trial will take but we have two trials scheduled this week.

The second one is set to start Wednesday.  So we need jurors for both of those cases.  So I know that this is a burden on you, all of the attorneys who are present know that this is a burden on you. . . .

You must be a citizen and resident of the United States, you must be a resident of this parish and must have been for the last year, you must be at least 18 years old, you must be able to read, write and speak the English language, you must not be under an interdiction order, not be interdicted and if you've been convicted of a felony and not pardoned, then you're not qualified.  If you have any personal reasons that you feel makes it impossible for you to serve, a physical illness, or mental condition, something personal, you are also welcome to come up and tell me about that.  If you're . . . let me go ahead and start with that list and come up if you think . . . if you're over the age of 70 you can request that you be excused and I have to let you go if you want to.  But you don't have to.  You can certainly serve if you want to if you're over the age of 70.

If anybody thinks that you're exempt for any of those reasons, please come up.  Make a line right here.

Court's going to take a brief recess.

At a hearing on the defendant's Motion for Post Verdict Judgment of Acquittal or in the Alternative Motion for New Trial, several stipulations were entered.  The parties stipulated that Judges Jeansonne and Bennett recused themselves on January 24, 2006.  Additionally, seven people were excused by Judge Jeansonne in the courtroom on January 31, 2006, just before the trial began.  It was further stipulated that the defendant's case was first on the trial docket.

Pursuant to La.Code Crim.P. art 673, "[a] judge has full power and authority to act, even though a ground for recusation exists, until he is recused, or a motion for his recusation is filed."  Based on the language in *Clarke*, 857 So.2d 599, and *Price*, 274 So.2d 194, Judge Jeansonne could not act in the case at bar.  Although Judge Jeansonne recused himself from the case at bar, there were other matters pending on

the trial docket and, as Judge Jeansonne informed the jury, a second trial was scheduled to take place that week. There is no indication in the record that Judge Jeansonne had been recused from the second trial. Therefore, he would be presiding over that case. Furthermore, at the time Judge Jeansonne excused the prospective jurors at issue in this matter, the case at bar had not yet been called for trial. Accordingly, Judge Jeansonne did not perform an act in the case at bar.

We will now address the defendant's claim that attorney Jonathan Gaspard had a prospective juror excused by telephone request to Judge Jeansonne's secretary with no reason given for the excuse. At the hearing on the defendant's Motion for Post Verdict Judgment of Acquittal and in the Alternative Motion for New Trial, Gaspard testified that he called Maria Moreau and asked that his cousin be excused from jury service. Gaspard further testified that his cousin had no reason for not appearing for jury service.

Ms. Moreau testified that when an attorney calls her office and asks for a prospective juror to be excused, the prospective juror is excused. She testified that Gaspard called and sought to have a prospective juror excused, but had no recollection of the specific date he called.

We find no cases involving the excusing of a potential juror without a reason being set forth for the exemption. When a defendant complains, on appeal, about the excuse accepted by a trial court under La.Code Crim.P. art. 783(B), the following standard applies:

> The trial court is vested with broad discretion and is authorized to excuse a person from jury service either prior to or after his selection for the general venire jury pool if such service would result in undue hardship or extreme inconvenience. The Court may take this action on its own initiative or on the recommendation of an official or employee designated by the Court. *State v. Brown*, 414 So.2d 726 (La.1982). See,

40

C.Cr.P. Art. 783(B). The discretion to release prospective jurors in advance of voir dire examination is not to be disturbed unless there is a showing of fraud or collusion resulting in prejudice to the accused. *State v. Edwards*, 406 So.2d 1331 (La.1981) [, *cert. denied*, 456 U.S. 945, 102 S.Ct. 2011 (1982)].

*State v. Collier*, 474 So.2d 529, 537 (La.App. 3 Cir. 1985).

The defendant has not alleged fraud or collusion, nor has there been any showing of prejudice. Therefore, the trial court's action in releasing potential juror Derek Gaspard prior to the commencement of jury selection, will not be disturbed as an abuse of discretion, and none has been proved by the defendant.

For the reasons set forth herein, this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NO. 4**

In his fourth assignment of error, the defendant contends the trial court erred in allowing simulation evidence. The defendant complains about the introduction of State Exhibits 23 L and M. State Exhibit 23 L is a photograph that was taken at 5:16 p.m. and depicts a person in the cross-hairs of a scope. The scope was set to the power of six and a quarter when the photograph was taken. State Exhibit 23 M is a photograph that was taken at 5:17 p.m. and depicts a person standing across a field. These photographs were introduced to show that a photograph could not be taken at the time of day that the shooting occurred in the case at bar. The defendant asserts that the fact that Detective Fennell was having a problem gathering photographic evidence near the time of the incident is not relevant, as it does not make the existence of any fact that is of consequence to the determination of the case more or less probable. Therefore, the photographs are not admissible under La.Code Evid. arts. 401-403.

The defendant also complains about the fact that Detective Fennel set up the gun involved in the incident in the courtroom and jurors were allowed to look through the scope with the power setting on 6.5 at an object two hundred forty-six feet away without the proper foundation proving the scope's power was set to 6.5 when he fired the gun.

The defendant contends the state was "attempting to introduce a recreation or reconstruction of the scene of the accident that is not admissible, due to admittedly substantial inaccuracies, through the back door by claiming its relevance was only to show magnification and that Detective Fennell had a hard time taking pictures." In support of his argument, the defendant cites *State v. Trahan*, 576 So.2d 1 (La.1990), wherein, the supreme court discussed reconstructed evidence and the standard applicable thereto.

Additionally, the defendant asserts the photographs introduced as State Exhibits 23 L and M were taken at a time different from the time when the shooting happened, under different lighting, and with different weed cover. Furthermore, the defendant argues the probative value of the pictures, along with the viewing of the scope, is greatly outweighed by the obvious danger of unfair prejudice, confusion of the issues, and the "total misleading of the jury" that La.Code Evid. art. 403 addresses. The defendant contends that no instructions to the jury that the viewing was to show magnification or that the pictures were to show that it was difficult to get an accurate picture at the time the shooting occurred will "un-ring that bell."

The state asserts that, because Blake testified that the rifle and scope had been neglected, it was necessary to show the jury that the scope worked and to explain to the jury that it was impossible to recreate or simulate the crime scene at the time of

42

the fatal shot. The state further asserts that State Exhibits 23 L and M were introduced for the sole purpose of explaining to the jury that there was no way to recreate or show the clarity of the scope on the date of the offense. The state asserts the jury was aware that the photographs were not taken at the time of the incident or under similar weather conditions, and the photographs did not create confusion, but dispelled the confusion and avoided speculation. Therefore, if any error was committed, it was harmless.

The state contends that it proved, through the testimony of Dauzat and Detectives Fennell and Schaub, that the scope's power setting was never changed after the gun was found. The state asserts that Dauzat testified the gun was unloaded and that was all that was done to the gun before he turned the gun over to Detective Schaub, who sealed it in a box. Detective Fennell then brought the sealed box to the crime lab where he and Stelly brought it to the shooting range in Alexandria. The gun was then fired and repackaged. The gun was then introduced at trial and Detective Schaub broke the seal on the box. The state asserts there was absolutely no evidence indicating the power setting on the scope had been moved from the setting it was on when the defendant fired it. In brief the state asserts the jury was allowed to look through the scope to decide if the scope functioned.

The state further asserts that if it was error for the trial court to allow the jury to look though the scope, the error was harmless. This conclusion is based on the fact that during jury deliberations the jury requested to see pictures of Roy lying in the water wherein his clothing was visible and the defendant's voluntary statement. The state asserts that had the jury been confused by the photographs and its having looked through the scope, it would be a logical conclusion that the jury would have asked to

43

view these items as well. The state further asserts that the cases cited by the defendant are inapplicable to the case at bar because the state did not attempt to recreate the scene or simulate evidence.

We first address the defendant's complaint regarding the jury peering through the scope during trial. We do not consider the evidence presented by the state reconstruction or simulation evidence. Therefore, we will review the issue under La.Code Evid. art. 401, *et seq.*

> All relevant evidence is admissible, except as otherwise provided by law. La. C.E. art. 402. La. C.E. art. 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, risk of misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403; *See State v. Mosby*, 595 So.2d 1135, 1138 (La.1992). Absent a clear abuse of discretion, the trial judge's determinations concerning relevancy and admissibility should not be overturned. *State v. Vaughn*, 431 So.2d 358, 361 (La.1982); *State v. Bates*, 397 So.2d 1331, 1334 (La.1981) (same); *State v. Stramiello*, 392 So.2d 425, 427 (La.1980) (same).

*State v. Cosey*, 97-2020, pp. 13-14 (La. 11/28/00), 779 So.2d 675, 684, *cert. denied*, 533 U.S. 907, 121 S.Ct. 2252 (2001).

At trial, the state asserted the gun was set up for the "sighting of 246 and a half feet away." Defense counsel objected at that time. Defense counsel argued that it served no purpose to let the jury look through the scope "to try to draw conclusions that are completely unrelated with the conditions of the shooting and are completely unreliable because of the lack of chain of custody as it pertains to the setting on the scope." The state addressed the chain of custody issue and again asserted the sole purpose of the viewing was for magnification purposes. Defense counsel countered with the assertion that the viewing was prejudicial because the magnification was not

44

reliable and the conditions were not similar. The trial court ruled as follows: "Well I think what your argument counsel is goes more to the weight than the admissibility so the court is going to allow the demonstration."

The state asserted the gun was set up for the sighting of two hundred forty-six and a half feet and to show magnification. Both the distance from which the defendant fired the gun and the magnification of the scope were relevant to the State's case. It was made clear to the jury that this was not an accurate representation of what could be seen at the time of the accident and the conditions were not the same. We find no abuse of the trial court's discretion in allowing the demonstration.

The two photographs the defendant complains about were the subject of a pre-trial writ in which this court found there was no error in the trial court's ruling that the photographs were admissible. *See State v. Desoto*, an unpublished writ opinion bearing docket number 05-1483 (La.App. 3 Cir. 1/4/06). Further review of this issue is not precluded. In *State v. Gauthier*, 04-1608, p. 8 (La.App. 3 Cir. 11/2/05), 916 So.2d 314, 320, *writ denied*, 06-465 (La. 9/22/06), 937 So.2d 378, this court held the following:

> [T]he court's prior review of the issue does not automatically preclude its review on appeal. The supreme court has explained:
>
> > When this court considers questions of admissibility of evidence in advance of trial by granting a pretrial application for supervisory writs (rather than deferring judgment until an appeal in the event of conviction), the determination of admissibility does not absolutely preclude a different decision on appeal, at which time the issues may have been more clearly framed by the evidence adduced at trial. Nevertheless, judicial efficiency demands that this court accord great deference to its pretrial decisions on admissibility, unless it is apparent, in light of the

45

> subsequent trial record, that the determination was patently erroneous and produced an unjust result.

*State v. Humphrey*, 412 So.2d 507, 523 (La.1981).

After reviewing the record we do not find this court's prior determination was patently erroneous and produced an unjust result. Therefore, we will not disturb this court's prior ruling.

## CONCLUSION

The defendant's conviction and sentence are affirmed. However, the matter is remanded for the trial court to impose a supervision fee as a condition of the defendant's probation. The trial court is instructed to follow the procedure set forth in *Harris* if it chooses to impose the minimum fee. Alternatively, if the trial court chooses to set a higher fee, it must vacate the sentence imposed and resentence the defendant in open court. Additionally, the trial court is instructed to amend the minutes of sentencing to delete the statement that the trial court ordered the defendant to pay a probation supervision fee of $55.00 per month.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**